**In re Kenneth Lee MICKENS, Debtor.**

**U–Save Auto Rental of America, Plaintiff,**

v.

**Kenneth Lee Mickens and Yvette Mickens, Defendants.**

**In re Yvette Mickens, Debtor.**

**U–Save Auto Rental of America, Plaintiff,**

v.

**Kenneth Lee Mickens and Yvette Mickens, Defendants.**

**Bankruptcy Nos. 96–59506–ASW, 99–53743–ASW.**
**Adversary Nos. 99–5250, 99–5249.**

United States Bankruptcy Court, N.D. California.

April 14, 2004.

---

13. *Id.*

14. *Id.*

Stanley A. Zlotoff, Law Offices of Stanley A. Zlotoff, San Jose, CA, for Debtors and Defendant.

Jeffrey C. Wurms, Wendel, Rosen, Black and Dean, Oakland, CA, Charles P. Maher, Luce, Forward, Hamilton and Scripps, San Francisco, CA, for trustees.

Sharon L. Kinsey, Law Offices of Sharon Kinsey, Soquel, CA, for Plaintiff.

Kevin M. Epstein, Office of the U.S. Trustee, San Jose, CA, for U.S. Trustee.

## MEMORANDUM DECISION DETERMINING DEBT TO BE NON-DISCHARGEABLE

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

Before the Court are identical amended complaints by U–Save Auto Rental of America ("Creditor") against Kenneth Lee Mickens ("Kenneth") and Yvette Mickens ("Yvette"). Kenneth and Yvette are married to each other and are, respectively, the debtors in the above-numbered Chapter 7[1] cases (collectively, "Debtors").

---

1. Unless otherwise noted, all statutory references are to Title 11, United States Code ("Bankruptcy Code"), as applicable to cases commenced on December 10, 1996 when

Creditor's amended complaints allege that the Debtors are indebted to Creditor, and seek a determination that such debt is excepted from the Debtors' Chapter 7 discharges pursuant to § 523(a)(6) as arising from willful and malicious damage to property, and/or pursuant to § 523(a)(4) as arising from embezzlement or larceny.

The amended complaints were tried together and the matters have been submitted for decision after post-trial briefing. Creditor is represented by Sharon L. Kinsey, Esq. and the Debtors are represented by Stanley A. Zlotoff, Esq. The Debtors did not appear at trial and called no witnesses, but excerpts of their deposition testimony were submitted by both parties—Creditor also submitted Kenneth's responses to discovery, and the Debtors also submitted a declaration by Kenneth that was filed on November 16, 2001 ("Declaration") in support of a motion for partial summary judgment. Creditor called the following witnesses at trial:

Thomas Sinnott ("Sinnott"), who participated with the Debtors in a business known as Automart U.S.A. LLC ("Automart").

Maria Flemate ("Flemate"), who participated with the Debtors in various business activities.

Edward Pearson ("Pearson"), Creditor's Fleet Director.

James Kevern ("Kevern"), who was hired by Creditor to locate vehicles that Creditor had leased to Automart.

Sylvia Hernandez ("Hernandez"), an investigator for the California Department of Motor Vehicles ("DMV").

---

Kenneth filed his Chapter 7 petition, and on May 27, 1999 when Yvette filed her Chapter 7 petition.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

It is undisputed that the Debtors, Sinnott, and Sinnott's then-wife Dori Sinnott ("Dori") formed Automart in March 1997 as a limited liability company, with each member holding an equal share of the company. Sinnott testified that Automart's business operation initially consisted of selling used vehicles, but he expanded it five months later to include a vehicle rental franchise with Creditor. Pearson testified that Creditor considered the franchisee to be Automart, with Sinnott "kind of like a managing general partner for the legal owner of the franchise", and with the franchisee's obligations to Creditor guaranteed by each member of Automart.[2]

According to Sinnott, he and Kenneth met with Creditor's representative and "went over the entire program" for the franchise. He said that the representative told them that Automart could lease vehicles from Creditor only for use in renting them to Automart's customers—at the end of a lease term, Automart would have the option of returning a vehicle to Creditor or selling it to an Automart customer and paying Creditor for it. Pearson's testimony confirmed that those were the terms of the franchise agreement, with the franchisee being required to pay Creditor the "book value" of any vehicle that was not returned to Creditor.[3] Kenneth testified at his deposition that he understood, both

from the meeting with Creditor's representative and from Sinnott's report of training given by Creditor, that Automart had the right to sell the vehicles provided by Creditor, but he knew that Creditor held title and so "of course" must be paid for the vehicles. Sinnott testified that Automart sold only one of Creditor's vehicles while he was with the business—he said that a renter wanted to buy the car and Pearson "made an exception" and authorized Sinnott to sell it, but Sinnott did not know whether any of the proceeds were turned over to Creditor because "once I told [Kenneth] we'd sold it, I had nothing more to do with it".

Sinnott testified that he had eighteen years' experience in the automobile industry, but none with rentals. He said that he and Yvette attended a week-long training seminar conducted by Creditor in Baltimore, where the "whole [Creditor] program" was again explained, including the use and disposition of vehicles. According to Sinnott, Kenneth arranged for Yvette to take over from Dori as business manager of both the rental and sales parts of Automart, to "make sure the books were up to date, handle all the money, be sure the taxes and DMV fees were sent out properly", etc. He said that Kenneth "really didn't participate" in the rental business while Sinnott was with Automart and Sinnott did "99%" of that work, although Yvette kept the books and handled the funds. Kenneth testified at his deposition that Automart "delegated responsibilities out" and Sinnott "was the one that was over the [Creditor] program". Sinnott testified that he met with representatives of

---

**2.** The record does not include a copy of the franchise agreement, but the Debtors have not disputed Pearson's testimony concerning it.

**3.** The term "book value" refers to a contractually fixed amount (reflecting depreciation that occurs during the lease term) that Credi-

tor agrees to accept in lieu of a vehicle being returned at the end of its lease term. The evidence did not suggest that "book value" was or was not intended to reflect the actual market value of any given vehicle.

Creditor weekly in person or by telephone, and never refused to talk to Creditor's representatives—Kenneth testified at his deposition that he recalled one time when Sinnott did refuse to talk to a representative of Creditor who visited Automart for the purpose of meeting with Sinnott.

Sinnott testified that he left Automart in February 1998 because he had "seen some different philosophies of how to run a business and thought it would be best" to leave. He said that, though the members held regular meetings at first, he "couldn't get the answers I wanted" about Automart's finances and had asked to see financial statements ten or twelve times, but the records were "never there, always at home". Kenneth testified in his deposition that Sinnott "left and ran", and "just left us holding the bag. And I picked up the responsibilities and went and paid people off the best that I could. I paid the auction off $60,000, $70,000, that he caused a problem with. And the same thing with [Creditor]. We struggled". Kenneth testified at his deposition that the Debtors did not receive salaries from Automart and "the only income we took was to pay our mortgage" of approximately $3,700 per month.

Sinnott testified that, while he was with Automart, the company purchased a house in Oakland because Kenneth "thought it would be a good investment" to remodel and sell it "to put money back into the business". According to Sinnott, Kenneth wrote checks from the Automart account to purchase the house but "the majority" of the remodeling expense was charged to Sinnott's credit card. He said that he did the remodeling work with help from an Automart employee over a five week period and it was "probably 90% finished" when he left Automart; it needed only carpet installation at a cost of $700 or $800 and he was told that Kenneth intended to complete the work. Sinnott acknowledged that title to the property was held by both Automart and himself, but said that he did not remember why his name was on title; he later filed bankruptcy and scheduled the property as an asset of Automart, but it was sold in his bankruptcy case. Sinnott stated that he did not know what the property was worth at any point and did not know what it was sold for—he said that he was originally told that the property was unencumbered but later learned that there was a mortgage. Kenneth stated in his Declaration that the property was "purchased cheap as a fixer-upper" and was intended to be an investment for Automart. He said that Automart's funds were used for the remodeling work but Sinnott "refused to release himself from the title" so that Automart could sell the property, and the court handling Sinnott's bankruptcy case ruled that the property belonged to Sinnott's bankruptcy estate. Kenneth testified at his deposition that the property was purchased for $42,000, was remodeled by himself and Sinnott, and was then worth $100,000 with a mortgage of $19,000. He said that "what we were going to do was sell it and pay off some of our bills and get our bills paid off", "the whole purpose of the home was to pay off all of the bills"—but Sinnott "made promises and he made promises, and he refused to sign off on the title, on the deed. If he would have signed off on the deed, we wouldn't be sitting here right now because the bills would have been paid".

Pearson testified that he learned in late March 1998 that Automart was delinquent in its lease payments to Creditor, but the Comptroller's department decided to defer collection attempts. In August 1998, payments remained in arrears and Pearson found that Automart's telephone was not being answered. He sent a representative to visit the lot, who reported there were no vehicles or people there. Pearson then

terminated the franchise and the parties agree that thirteen vehicles owned by Creditor were unaccounted for by Automart at that time. As noted below, Creditor recovered four of those from an auction facility and then sold them for amounts less than their book value, Creditor recovered more than the book value of one from a third party, and Automart sold five without remitting any of the proceeds to Creditor. It is undisputed that Creditor recovered all or part of the other three vehicles' book value: one was turned over by Sinnott and sold by Creditor for $1,793 more than its book value; one was sold by Automart and Creditor received $7,484 less than its book value from a third party; Creditor located one at a painting facility and sold it for $7,509 less than its book value.

Hernandez testified that she had been an investigator with the DMV for seven years and had been employed by the State of California since 1981 in other positions where she performed inspections and investigations. She said that, in July 1998, the DMV received "a number" of complaints about Automart from customers who had purchased vehicles without receiving registration or title documents. Hernandez met with Kenneth on July 6 about the complaints and he "assured" her that he would complete the paperwork necessary to transfer registration and title "within a reasonable period". At that meeting, Hernandez asked Kenneth about Automart's financial condition and he said "there was an issue of some refunds" owed to customers for overcharges of registration and license fees, but he was refinancing his home and would use some of those proceeds to pay those refunds—he also told her that Automart would cure sales tax arrears by the next month, and was "current and sound" with payments to auto auctions. At a further meeting on July 29, Kenneth told Hernandez that he had applied for a new DMV dealer license for a Nevada corporation formed June 6 under the name Competitive Advantage Force–1, which would do business under the name East Bay Auto Mart using Kenneth's home address in San Jose, with Yvette as Chief Financial Officer and Kenneth as General Manager. Hernandez said that she asked Kenneth if he would be leaving California and he replied that he would not, and would "assure that all vehicle transfers would be processed accordingly". Hernandez then received a letter from Kenneth dated July 31, stating that Automart had ceased doing business and enclosing the DMV dealer license. Hernandez sent Kenneth a demand for turnover of all dealer supplies, including the "vehicle report of sale books" that DMV required dealers to maintain; that material was not immediately forthcoming, but was eventually turned in to the DMV. On August 19, Hernandez told Kenneth that she had recently received a complaint from Creditor about Automart's failure to account for thirteen vehicles, and asked whether he had sold those. According to Hernandez, Kenneth replied that he was permitted to sell them after 120 days, he did not have title to them, and he had "made the payoffs last week" by sending Creditor two checks; he said that he had not sold the vehicles to customers and five or six of them were at Bay Cities Auction ("Bay Cities") where he "was running them through the auction". Hernandez testified that Automart's records showed six of those vehicles to have been sold to customers, some of whom had filed complaints with the DMV and three of whom identified a photograph of Kenneth as the Automart General Manager or owner with whom they had dealt; none of the buyers reported having dealt with anyone else. Hernandez said that the sale transactions were all the same except for a sale to

Wallace Haynes ("Haynes"); that sale was the only one that Automart purported to have financed and Haynes received a letter dated September 22, 1998 signed by Yvette, which directed him to make his monthly payments of $318.72 to Automart's post office box in California. Hernandez testified that her investigation showed that Automart owed approximately $40,000 in sales taxes and its seller's permit was eventually revoked: returns signed by Dori had been filed for April 1997 through August 1997 with payments enclosed; returns were filed for September 1997 through November 1997 without payments; returns signed by Yvette were filed in February 1998 and March 1998 without payments; a payment of $2,300 was received on July 31, 1998 and applied to the taxes owed for February. Hernandez also testified that she learned through her investigation that Kenneth had filed a petition under the Bankruptcy Code in December 1996, which he did not disclose on his application for a DMV dealer license. Hernandez completed her investigation and prepared a report of it dated December 21, 1999, which she submitted with a recommendation to the District Attorney that Kenneth be charged with theft and perjury. She testified that no criminal charges were brought and the only administrative action taken by the DMV was revocation of Automart's dealer license. Hernandez' report lists six instances where Automart sold vehicles owned by Creditor without paying Creditor (and without submitting title or registration information to the DMV): to Butler on November 8, 1997 for $13,539; to Moncrease on December 13, 1997 for $14,099.04; to Dinkins on June 6, 1998 for $12,142.04;[4] to Brooks on June 10, 1998 for $12,485.62; to Haynes on June 17, 1998 for $7,599.53;

to Coelho on July 31, 1998 for $12,963.79. Kenneth admitted in his Declaration that Automart made those sales and deposited the proceeds into Automart's general operating account, though the Debtors offered no corroborating evidence, nor explain a reason for it being unavailable. He said that the proceeds were not remitted to Creditor because Automart was "operating at a deficit" but the Debtors believed at the time of the sales that "they would be able to generate income thereafter in sufficient amounts to repay" Creditor. It is undisputed that the book values of the five vehicles for which Creditor received nothing (excluding that sold to Dinkins) totaled $37,355.

Kenneth testified at his deposition that, when Automart closed down, "Whatever we had that was on the lot, we took to" an auto auction facility and "when I delivered them, I don't remember which vehicle it was, there was a repo guy there, and I had the keys and he kept on going.... We never received any proceeds. We can't. Once we dropped the vehicles off and we walked away". Kenneth said that he did not tell Creditor he was taking the vehicles to the auction facility but did tell Sinnott "that the vehicles were to be dropped off there. And then—I don't remember, some guy, and I don't remember the guy, but we had to give the keys to him and that was it.... There was a guy that was there. We didn't take the cars into the auction. We didn't take the cars to the auction—I mean, inside the auction. They were in the parking lot of the auction, and the keys were handed off to a representative from [Creditor]." Kenneth stated that he did not take the vehicles to the auction for the purpose of selling them and they were

---

4. Creditor eventually recovered from a third party an amount exceeding the book value of   the vehicle sold to Dinkins.

merely "dropped off in the parking lot of the auction, and your repo guy, or whoever the guy is, the representative of [Creditor], was there and picked the vehicles up. Whatever he did after that, I don't know". Hernandez testified that it is possible to sell a vehicle through an auto auction without having title, if the auction has received an application from a dealer or licensee who is deemed creditworthy and is willing to accept the vehicle without title documents; however, her investigation did not find any such applications from Automart for sale of the vehicles owned by Creditor.

Kevern testified that Creditor hired his firm on August 19, 1998 to locate and recover vehicles that had been leased to Automart. He said that he visited Automart's lot and was told by some men who were "hanging out there" that they had seen "somebody removing cars" and gave Kevern a "tip to go look at" Bay Cities. Kevern found some [5] of Creditor's vehicles in the parking lot at Bay Cities, reported to Creditor, and was told to take them into the auction for storage. Kevern said that he was preparing to tow the vehicles out of the parking lot when a man who identified himself as Kenneth "came running out" of the auction, was "very upset", said that he owned the vehicles, and told Kevern that he was picking them up to take "someplace" but did not say where. When Kevern explained that he was repossessing the vehicles for Creditor, Kenneth "got a little nervous and jumped in his car and left". Kevern then made a key for each vehicle and prepared a "condition report" for Creditor—it is undisputed that the four vehicles repossessed by Kevern were ultimately sold by Creditor at auction for prices totaling $4,237 less than their book values. According to Kevern, vehicles that are to be sold by being "run through the auction" are "checked into the auction" and then labeled with a number and a letter—he said that the ones he found in the parking lot bore such labels, which meant that they had been checked in for sale but removed to the parking lot by a manager. Kevern stated that "apparently there was a reason the auction couldn't sell them, the auction wouldn't have taken them out of the auction and put them back in the parking lot after they'd already been checked into the auction", and he believed the reason to be that title was held by Creditor. Kevern explained that the parking lot where he found the subject vehicles was distinct from storage lots that are provided by Bay Cities, and vehicles checked in for storage are labeled differently from those intended for sale; the subject vehicles were labeled for sale rather than for storage.

Flemate testified that she had known Kenneth since 1995 and "gave" him some $40,000 or $50,000 with which to purchase vehicles for Automart, under a written agreement whereby she was to receive $1,300 for each vehicle sold. She believed that Automart did purchase and sell vehicles pursuant to that agreement, but she collected only $1,300 because Kenneth "was having financial problems with the dealership and wasn't able to pay me back". She said that one Automart check to her for $12,000 labeled "investment" was actually repayment of a loan that she had made prior to the written agreement, and denied that various Automart checks made payable to "cash" represented payments to her. Flemate testified that a corporation known as CAF–1 [6] commenced

5. Kevern said that the number was seven or eight, but the parties agree that it was four.

6. Flemate described Competitive Advantage Force–1 as "the business in California, Automart" and CAF–1 as "the one that was specific to Pahrump," with no connection between the two entities. Kenneth stated in his Declaration that the former was a Nevada corpora-

doing business in Nevada under the name Pahrump Auto Center ("PAC") in December 1998, with Yvette and Flemate as officers. Flemate provided the funds to start the business and was to share in profits as an offset for her unpaid loans to Automart, with Yvette receiving 60% of profits—Kenneth did "a lot of legwork" to start the business but invested no money in it and was not to share in profits (although he was to receive a salary as General Manager). She said that she believed PAC received some vehicles from Automart, but none with title held by Creditor. Flemate also commenced operating a Practical Rent–a–Car ("Practical") franchise in Nevada during November 1998, which "fell under the corporation [CAF–1] after awhile". Flemate testified that she and Yvette handled receipt of payments at PAC and that she was not aware of PAC receiving funds belonging to Automart, although she acknowledged that three checks made payable to Automart by Haynes were deposited at Nevada banks where PAC held accounts. According to Flemate, PAC never made a profit (or even enough to pay salaries), CAF–1 filed a Chapter 11 petition in October 1999, and PAC "lost our license" and was "ordered to close our doors" in late November 1999. As for Practical, Flemate testified that she stopped operating the business in early 1999 after Creditor acquired the franchise and failed to provide training that Flemate had expected to receive. She said that Practical was permitted to sell vehicles and pay Creditor upon sale, which was done for all sales. Flemate stated that Practical was in possession of some thirty vehicles

when it ceased operations, some of which were returned or sold, and some of which were in the hands of long term lessees—when she left, eight vehicles were unaccounted for and Debtors "had all of the paperwork and everything".

## II.

### ANALYSIS

#### A. Standards For Determination of Dischargeability

■ The Bankruptcy Code is "designed to afford debtors a fresh start, and we interpret liberally its provisions favoring debtors", *see In re Bugna*, 33 F.3d 1054, 1059 (9th Cir.1994). The Code's limited exceptions to the general policy of discharge are found in § 523(a) and are to be construed narrowly, *see In re Riso*, 978 F.2d 1151 (9th Cir.1992). The plaintiff in an action for determination of dischargeability under § 523(a) bears the burden of proving all elements of the claims for relief asserted by a preponderance of the evidence, *see Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

#### B. Exceptions To Discharge

Creditor seeks a determination that its claim against Debtors is non-dischargeable pursuant to either or both of two exceptions to discharge that are provided by § 523(a): § 523(a)(6), regarding willful and malicious damage to property; and/or § 523(a)(4), regarding embezzlement or larceny. Creditor alleges that sale of its vehicles without turnover of any proceeds

tion that "bore a relationship to Automart" and the latter was a Delaware corporation that "was affiliated with the Nevada businesses", and "[t]he reason for the use of the Competitive Advantage Force–1 entity with respect to Automart, U.S.A. was that, toward the end of its existence, Automart owed tax

debt and was being subjected to tax levies on bank accounts. The use of a bank account under Competitive Advantage Force–1 for purposes of transacting Automart business was simply a way to avoid the interruption of business entailed by tax levies".

to Creditor constituted one or more of those torts.

As a threshold matter, it must be noted that, according to the testimony of Creditor's employee Pearson, Creditor's franchisee was Automart, not the Debtors. Therefore, it was Automart that was contractually bound to pay Creditor the book value of the subject vehicles if they were sold. The Debtors guaranteed the debts of Automart under the franchise agreement with Creditor, so they are contractually liable for any such debts that Automart did not pay—but such liability would merely constitute a dischargeable breach of contract unless an act under § 523(a)(6) or (4) was performed by one or both of the Debtors.

With respect to the sales, Hernandez testified that three of the subject vehicles were sold to buyers who identified Kenneth as the Automart representative with whom they dealt, and that none of the buyers reported dealing with anyone else. Sinnott testified that he did "99%" of the rental work and Kenneth "really didn't participate" in that, which is consistent with Kenneth's deposition testimony that Automart "delegated responsibilities out" and Sinnott "was the one that was over the [Creditor] program". However, it is undisputed that Sinnott left Automart in February 1998, and only two of the subject sales occurred prior to that time (in November and December 1997, respectively, to Butler and Moncrease); and Sinnott testified that he was aware of only one sale while he was with the business. There is no indication that Sinnott was responsible for anything that occurred after he left the business, and none of Hernandez' witnesses reported dealing with anyone other than Kenneth when they bought vehicles from Automart. Accordingly, the evidence supports a finding that Kenneth is the one

who acted on behalf of Automart to make the sales.

Insofar as failing to remit any of the sale proceeds to Creditor is concerned, Sinnott testified without contradiction that he did not handle the proceeds from the one sale that he knew about and that Yvette handled Automart's funds and bookkeeping, so the evidence does not show that Sinnott participated in the disposition of sale proceeds either before or after he left the business. Kenneth admitted that all of the subject sale proceeds were deposited into Automart's operating account, and he did not allocate responsibility for that decision as between himself and Yvette—even if Yvette did not participate in making that decision, she was the bookkeeper and so must have known of the sale proceeds, and known that they were not remitted to Creditor. Therefore, the evidence supports a finding that the Debtors were both responsible for failing to turn over any of the sale proceeds to Creditor.

Accordingly, if the sales and failure to remit proceeds constituted acts within the meaning of § 523(a)(6) or (4), the evidence shows that Kenneth made the sales and that both Debtors failed to remit any proceeds to Creditor.

### (1) § 523(a)(6)

█ A debt arising from willful, malicious damage to the property of another is excepted from discharge pursuant to § 523(a)(6). The elements of a claim under § 523(a)(6) have been established by *In re Jercich*, 238 F.3d 1202, 1208–09 (9th Cir.2001) ("*Jercich*"):

We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under [*Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)], the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective

motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct.... A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. [internal quotation marks and citation omitted]

The Ninth Circuit noted in *In re Su,* 290 F.3d 1140, 1147 (9th Cir.2002) ("*Su*") that willfulness and malice are two separate requirements that are not to be "conflated" into a single inquiry, and made it clear that each alternative prong of the willfulness showing must be based on a subjective standard:

The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su,* at 1146.

### (a) Sales

▮ With respect to selling Creditor's vehicles, Pearson testified that Automart had the option of selling vehicles at the end of their lease terms, and the evidence does not clearly establish whether any of the subject sales occurred prior to those times. If sales were made at a time when Automart had no contractual right to sell, such sales would constitute conversion under California law, *see In re Peklar,* 260 F.3d 1035, 1037 (9th Cir.2001) ("*Peklar*"):

Conversion is defined under California state law as "the wrongful exercise of dominion over the personal property of another." *Taylor v. Forte Hotels Int'l,* 235 Cal.App.3d 1119, 1124, 1 Cal.Rptr.2d 189 (1991). "The act must be knowingly or intentionally done, but a wrongful intent is not necessary." *Id.* (citing *Poggi v. Scott,* 167 Cal. 372, 375, 139 P. 815

(1914); 5 Witkin *Summary* of Cal. Law (9th ed. 1988) Torts § 624, pp. 717–18). Under California law, "a conversion is not per se always a willful and malicious injury to the property of another." *Larsen v. Beekmann,* 276 Cal.App.2d 185, 189, 80 Cal.Rptr. 654 (1969).

Assuming for the sake of argument that the sales were made too early and therefore did constitute conversion, the issue is not whether Automart was actually entitled to sell any given vehicle at the time it was sold, but whether Kenneth reasonably believed that Automart had such a right, *see, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332–33, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) ("*Davis*"):

[A] wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one.... The discharge will prevail as against a showing of conversion without aggravated features.

Kenneth's uncontradicted testimony was that he believed Automart had a right to sell Creditor's vehicles, based on what he was told by Creditor's representative and also on Sinnott's report of training received from Creditor. That is consistent with Hernandez' testimony that Kenneth told her the vehicles could be sold "after 120 days". Sinnott testified that Pearson "made an exception" and authorized Automart to sell one vehicle during Sinnott's tenure, which suggests that the sale occurred prior to expiration of the lease term but Creditor was willing to permit it. The

evidence supports a finding that Kenneth reasonably believed that Automart was contractually entitled to make the subject sales. Under *Davis*, the sales were not willful and malicious acts within the meaning of § 523(a)(6) even if any of them did constitute conversion due to being made prior to the time permitted by Automart's franchise agreement with Creditor.

### (b) Failure To Turn Over Proceeds

■ As for the failure to remit any sale proceeds to Creditor, the exception of *Davis* does not apply. Kenneth's testimony was that he knew Creditor owned the vehicles and "of course" must be paid if they were sold, and there is no evidence that Yvette had any reason to believe otherwise.

The Debtors' failure to turn over any of the sale proceeds to Creditor was clearly a conversion as defined by *Peklar*, and the issue is whether that act was performed with the subjective intent required by *Jercich* and *Su* to make it a willful and malicious one within the meaning of § 523(a)(6). In this case, the crucial element of that test is whether the Debtors had "actual knowledge" that harm to Creditor was "substantially certain to occur as a result of [their] conduct". Debtors argue that this was not the case, because Creditor's vehicles were sold in the ordinary course of Automart's business and they were hoping to make the business solvent (perhaps by selling the Oakland investment property) [7] so that Creditor could be paid. Kenneth's testimony on the subject was that the sale proceeds were deposited into Automart's operating account and never turned over to Creditor because the business was "operating at a deficit", but

that Debtors believed when the sales were made that "they would be able to generate income thereafter in sufficient amounts to repay" Creditor. That testimony is not corroborated by other evidence, and it is not credible in light of the evidence as a whole.[8]

First, on the issue of the Debtors' credibility in general, the Court notes that they chose not to appear at trial, which tends to support a negative inference that they may have sought to avoid cross-examination under oath—since Hernandez' report did not result in criminal charges against them, their reluctance to testify in person does not seem to be based on the constitutional protection against self-incrimination, and Debtors did not offer any excuse for their failure to appear. The Court also notes that Kenneth admitted that Automart used a bank account in the name of Competitive Advantage Force–1 in order to "avoid the interruption of business entailed by tax levies", a ploy that might be considered equivalent to defrauding creditors. Overall, the Debtors' attitude did not appear to be forthcoming and candid.

Second, Kenneth first met with Hernandez about customer complaints on July 6, 1998, then wrote to her on July 31, 1998 to surrender Automart's DMV dealer license and announce that the business had closed. The sale to Coelho was made on the date of that letter, and four other sales were made during the month of June. Hernandez testified that she asked Kenneth on August 19 whether he had sold Creditor's thirteen missing vehicles and he told her that he had not but had paid Creditor for them, both of which statements were false.

---

7. Sinnott testified that Automart purchased the Oakland property while he was there, that he left in February 1998, and that the property was administered in his bankruptcy estate, but the evidence does not show when that

occurred. The Court notes that most of Creditors' vehicles were sold in June 1998.

8. unidentifiable footnote.

Third, Hernandez said that Kenneth also told her that he planned to sell five or six of the vehicles at Bay Cities, yet his testimony was that he did not take them there to sell but only to deliver to Creditor, and that he gave the keys to a "repo guy". However, Kevern testified that, when he found some of Creditor's vehicles at Bay Cities, Kenneth represented himself as the owner and said that he was picking them up to take away, but became "very upset" and "nervous" when he learned that Kevern wanted to repossess the vehicles for Creditor, and Kevern had to make keys for the vehicles after Kenneth left. Kevern also testified credibly that the vehicles appeared to have been placed for sale at the auction but later removed to the parking lot by a Bay Cities manager because Kenneth did not have title certificates for them.[9]

Fourth, there is no evidence that the Debtors communicated with Creditor about intending to pay Creditor the book value of the vehicles that were sold, nor that the Debtors made any efforts to pay. Kenneth testified that "we struggled" to pay Automart's creditors after Sinnott left, but the Debtors offered no evidence in corroboration. Instead, the evidence shows that, less than six months after Automart closed, the Debtors formed a corporation to open two new automobile dealerships in Nevada (although Kenneth told Hernandez on July 29, 1998 that he did not intend to leave California), which did not last a year, lost its license to operate the businesses, and filed bankruptcy.

In short, the evidence does not suggest that, when most of the subject sales were made in June 1998, the Debtors had some kind of good faith plan (even an ultimately futile one) to raise funds with which to pay Creditor the amounts that should have been paid upon sale. There was no apparent attempt to keep Automart operating after those sales—its dealer license was surrendered to the DMV just a month later, on the same day that the last sale was made and only some three weeks before Kenneth attempted to sell still more of Creditor's vehicles at Bay Cities. Since Automart was not going to continue operations, its insolvency should not have prevented the Debtors from remitting the book value portion of the sale proceeds to Creditor and leaving someone else unpaid when the business was closed a month after making most of the sales. And the Debtors did not offer evidence showing that Automart was paying at least some of its bills in an effort to stay afloat during the time that most of Creditors' vehicles were sold, nor any evidence showing a pattern of prior sales for which Creditor was paid.

The evidence includes copies of many checks drawn on the Automart account, which Creditor contends show that the Debtors were improperly using company funds for themselves, including the sale proceeds that should have been turned over to Creditor. However, that evidence is inconclusive, since there was little testimony about the checks and the most that can be discerned from the quasi-legible copies is that many are payable to "cash" and some are for large amounts of several thousand dollars—as the Debtors point out, the copies do not usually show the purpose of the checks, which could have

---

**9.** Kevern testified that he found seven or eight of Creditors' vehicles at Bay Cities, yet the parties agree that there were only four. However, that event occurred five years prior to trial and his testimony was credible overall.

His explanation about the difference between identification and location of vehicles placed at Bay Cities for sale *vs.* for storage was plausible and was not impeached or discredited.

been for payment or reimbursement of legitimate business expenses.

The Court also notes, without relying on it, that Hernandez concluded after her investigation that the Debtors had committed theft and perjury.

Taken together, the evidence does not support the Debtors' position that they failed to remit any proceeds to Creditor because Automart was insolvent but they hoped to acquire other funds in future that could be given to Creditor. Rather, it suggests that the Debtors knew they were going to close the business and they were attempting to extract as much money from it as possible, whether to pay selected creditors (perhaps the sales taxes for which they could remain liable despite bankruptcy) or to pay themselves or for some other purpose of their own, but not for the benefit of Creditor whose vehicles had been sold, or even in an attempt to save the struggling business. Since there is no evidence of when the Oakland property was purchased or lost in Sinnott's bankruptcy case, the Debtors have not shown that they were planning to repay Creditor with funds obtained from sale of that property. Accordingly, the Debtors must be charged with "actual knowledge" that harm to Creditor was "substantially certain to occur as a result of [their] conduct" in selling Creditors' vehicles without remitting any of the proceeds to Creditor. The Debtors' failure to turn over to Creditor the book value portion of the proceeds from sale of the subject vehicles constitutes non-dischargeable willful and malicious damage to Creditor's property pursuant to § 523(a)(6).

### (2) § 523(a)(4)

A debt arising from embezzlement or larceny is excepted from discharge pursuant to § 523(a)(4).

The elements of a claim based on embezzlement are:

(1) property owned by another is rightfully in the possession of a bankruptcy debtor;

(2) the bankruptcy debtor appropriates such property to a use other than the use for which the property was entrusted to the bankruptcy debtor; and

(3) circumstances indicating fraud.

See, In re Littleton, 942 F.2d 551, 555 (9th Cir.1991) ("Littleton"); In re Wada, 210 B.R. 572, 576 (9th Cir. BAP 1997). To any extent that the vehicle sales were made at times authorized by Automart's franchise agreement with Creditor, the Debtors were rightfully in possession of the sale proceeds.

The elements of a claim based on larceny differ from those of a claim based on embezzlement only in that a larcenous bankruptcy debtor has come into possession wrongfully, 4 King, Collier on Bankruptcy (15th ed. rev.1997), § 523.10[2]. To any extent that the vehicle sales were made at times not authorized by Automart's franchise agreement with Creditor, the Debtors were wrongfully in possession of the sale proceeds.

The Debtors argue that the third element is not present because there are no circumstances of fraud, since they were merely attempting to salvage a failing business and hoped to pay Creditor in future, citing Littleton. In that case, the bankruptcy debtors were found to have "acted with the intent to benefit the corporation by securing financing so that the company could pay all its debts[,] ... [which] ... negates any contention that the debtors intended to defraud" the creditor, and they "applied their entire effort and resources to make the business survive[,] ... [which] ... was their dominant motivation", Littleton, at 556. As dis-

cussed above, the evidence in this case does not even remotely begin to support that description for what these Debtors did and failed to do, whereas it does show that their failure to turn over any sale proceeds to Creditor was marked by circumstances indicating fraud. The Debtors knowingly transferred Creditors' vehicles to third parties and received proceeds in exchange, which they knew they were required to turn over and intentionally did not—unlike the circumstances of *Littleton*, the Debtors' failure to remit any proceeds to Creditor was not part of a good faith effort to save their business in the hopes of being able to pay Creditor later. Accordingly, such failure constitutes non-dischargeable embezzlement and/or larceny pursuant to § 523(a)(4).

### CONCLUSION

Automart's franchise agreement with Creditor entitled Creditor to receive either thirteen vehicles or their book value. It is undisputed that Debtors failed to remit the proceeds from selling five of the vehicles with book values totaling $37,355, and that Creditor recovered (or accepted money for) the other eight vehicles. Creditor proved no damages under § 523(a) beyond the $37,355 total book values of the five vehicles that were sold by Automart.[10] Debtors are liable for that debt of Automart's under their guarantees, and it is excepted from their bankruptcy discharges as one for willful and malicious damage to property pursuant to § 523(a)(6), and as one for embezzlement and/or larceny pursuant to § 523(a)(4).

10. Creditor referred in argument and briefs to other damages, such as lease payments and fees called for by the franchise agreement, and Creditor's net receipt of less than book value for some of the vehicles that were recovered. As discussed above, the former arise from dischargeable breach of contract

Counsel for Creditor shall submit a form of judgment so providing, after review by counsel for Debtors.

rather than from non-dischargeable conversion, embezzlement, or larceny. With respect to the latter, the evidence does not establish the amounts of such losses, nor did Creditor establish that such losses actually arose from the Debtors' failure to remit the book value portion of sale proceeds.