In re Joy A. PERVIS, Debtor.

Hot Shot Kids Inc. and Brenda Pauley, Plaintiffs,

v.

Joy A. Pervis, Defendant.

Bankruptcy No. 10–75270–WLH.
Adversary No. 10–9061.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Signed May 29, 2014.

Quynh–Huong Nguyen Davis, Law Offices of Betty Nguyen Davis LLC, William A. Pannell, William A. Pannell, P.C., Kevin T. Moore, Atlanta, GA, for Plaintiffs.

G. Frank Nason, IV, Lamberth, Cifelli, Stokes Ellis & Nason, Atlanta, GA, for Defendant.

### ORDER AFTER TRIAL ON DISCHARGEABILITY OF DEBT

WENDY L. HAGENAU, Bankruptcy Judge.

[T]he jealousy, the greed is the unraveling

It's the unraveling

And it undoes all the joy that could be [1]

This is a story of three women whose jealousy and greed not only unraveled "Joy" (the Debtor), but unraveled what was and could have continued to be a valuable friendship and successful business discovering some of the best child talent in television and movies. Instead, jealousy over the Debtor's success with Dakota Fanning and greed on the part of all three women for money and notoriety have led them to fight for almost seven years, destroying friendships and weakening their businesses.

Over five days of trial, the Court heard the complaint of Hot Shot Kids, Inc. ("HSK") and Brenda Pauley ("Pauley") against the Debtor on the dischargeability of their claims remaining after the Court entered an order on July 24, 2013 on the Debtor's Motion for Summary Judgment ("Summary Judgment Order"). Since this is a request for judgment on a complaint to determine the dischargeability of certain debts, this is a core proceeding under 28 U.S.C. § 157(b)(2)(I), which the Court has authority to hear and finally determine under 28 U.S.C. § 157(b)(1). The parties have agreed that this Court may enter a final judgment on the merits of the claims and dischargeability thereof.

The claims remaining for trial and on which the parties presented evidence can be grouped into four main categories:

1. Pauley's Exhibit A Talent claim;

2. HSK's claim for payments made by Osbrink Talent Agency ("Osbrink") to Joy Pervis ("Pervis" or "Debtor" or "Defendant") on Non–Exhibit A Talent;

3. HSK's claims arising from Pervis' resignation from HSK and the formation of J. Pervis Talent Agency ("JPTA"); and

4. HSK's claims for conversion of HSK funds resulting from Pervis paying various personal expenses from HSK funds.

### FINDINGS OF FACT[2]

At its core, the dispute among the parties arises from the failed business relationship among Pervis, Pauley and Rebecca Shrager ("Shrager") while they worked in the child and teen talent industry. To fully appreciate the dispute among the parties, factual findings regarding the witnesses' understanding of the workings of the industry must be made. The Court does not profess to be an expert in the talent industry, but makes these findings based on the testimony in this case.

Suffice it to say, there are many people involved in making a child a star, and many of their duties overlap. First, the child must be "discovered". This is frequently accomplished through open calls, where auditions are held for anyone inter-

---

1. Joni Mitchell, All I Want (BMI 1971).

2. Additional factual findings are included in the discussion of each claim below.

ested in appearing in television, movies, or commercials, or in modeling. The open calls are run by agents or talent scouts. The child is interviewed, photographed, filmed, etc. If the child looks promising, the parents are contacted for further photos and interviews. Next, the child needs an agent. An agent's job is to find work for the child (also called the "talent") and negotiate a contract for the child. Agents get to know casting directors and others in the industry to facilitate the flow of information. The agent receives various industry announcements and e-mails of casting calls for all types of acting and modeling roles. Then, the agent sends her clients who fit the description to the casting calls (maybe in person or maybe via tape or photo). If the child is cast, the contract is negotiated and the child receives payment. The agent receives a commission on that work. The agent typically signs an agreement with the child. While the parties dispute whether the agreement is usually exclusive, they all agree, and the Court finds the agreements are terminable at will, either by their terms or because, as a practical matter, the agent is unlikely to hold a child to such an agreement, even through a parent or a guardian.

There are unions in this industry, including the Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA"). SAG and AFTRA regulate the activities of agents, among others. Some jobs are union jobs and the amount and method of payment to the child and the agent is set by union rules. If the job is non-union, then all items are negotiable by the agent, although the standard commission to an agent is 10%.

Some states also regulate the activities of agents. In California, one must be licensed by the state to act as an agent. If a Georgia agent has a client who wants to work in California, the Georgia agent can introduce the clients to a California agent (the parties disputed the use of the word "refer"). Not only is this required by law, but it makes good business sense. A California agent is much more likely to know California casting directors and be aware of California opportunities than a Georgia agent. A California agent, of course, wants to encourage out-of-state agents to refer its clients to the California agent. It is therefore typical for an arrangement to be made between the referring agent and the California agent to split the 10% commission the California agent receives. The agreement can be whatever the parties decide, but most commonly, the agreement is called a mother agency agreement or split commission agreement. Typically, the referring agency receives 30%–40% of the commission (or 3%–4% of the talent's earnings) and the California agency receives the balance. The term of the agreement is negotiable: it could be open-ended—paying the referring agency for as long as the California agency represents the child; it could be limited to a number of years—three to five years is a frequent term; or it could be limited to the initial term of the California agency's agreement with the child.

Often, the referring agent has little work to do while the child is working in California with a California agent. The California agent handles all agency duties in California. The referring agent, however, can be called upon to read scripts, attend premieres, help out and hold the child's (and parent's) hand. The referring agent does this not necessarily because she is required by the mother agency agreement to do so, but so the child will be successful and generate commissions in which the referring agency shares and so the relationship between the child and the referring agent remains cemented.

As a child becomes more successful, she may also hire a manager. A manager oversees the child's career generally, helping with decisions on which project to accept (in conjunction with the agent). A manager also reads scripts, attends premieres, holds hands and generally helps out. A person cannot be both an agent and a manager.

It is in this talent industry that the Debtor and the Plaintiffs worked. In 1997, Pauley, Pervis and Shay Griffin met and formed the talent agency, TG Inc. At the time, Pauley and Pervis each had their own businesses, with Pauley focusing on adult talent and Pervis focusing on child talent and child beauty pageants through her company, Hot Shot Kids. In 1998, the original Hot Shot Kids was administratively dissolved, but Pervis continued using the name as a division of TG Inc.

In 1999, TG Inc. held an open call for child talent, which was attended by Pervis. At the open call, Pervis "discovered" Dakota Fanning. In February 2000, Pauley and Pervis sent Miss Fanning's audition tape to several talent agencies in Los Angeles, including Osbrink. Osbrink is owned equally by Cindy Osbrink, and its vice president, Scott Wine. Osbrink expressed an interest in representing Miss Fanning, so Pervis and Pauley visited Osbrink in Los Angeles to finalize the arrangements. Osbrink, Pervis and Pauley entered into a mother agency agreement for Dakota Fanning whereby Osbrink agreed to share commissions received on work performed by Miss Fanning. Pursuant to this agreement, Osbrink paid a 3% commission to Pervis and Pauley for the work done by Miss Fanning. Anticipating commissions from Miss Fanning's work as well as from additional child talent they expected to refer to Osbrink, Pauley and Pervis established JB Entertainment ("JBE", which stood for "Joy" and "Brenda"). They owned JBE equally, and Osbrink was instructed to make the checks previously payable to TG Inc., to JBE. Neither the agreement with Osbrink nor the agreement between Pauley and Pervis was in writing. Miss Fanning continued to succeed. Other talent was referred to Osbrink, and it paid the same 3% mother agency commission on the talent, so JBE received commissions on a regular basis. Pervis and Pauley split the commissions 50/50, both using their portions for personal expenses.

In October 2002, Pauley and Pervis entered into a transaction with Shrager whereby the following occurred: (1) HSK was incorporated with Pauley and Pervis each holding 40% of the company and Shrager holding 20%; (2) all adult talent of TG Inc. was transferred to the People Store (owned 100% by Shrager); and (3) any child talent from the People Store was transferred to HSK. Pervis was the president of HSK and received a salary and an allowance for certain items, which is discussed more fully below. At the same time, the parties entered into a shareholder agreement dated October 31, 2002, among HSK, Pervis, Pauley and Shrager ("Shareholder Agreement"). Section 6.1 of the Shareholder Agreement is labeled "NonCompetition" and prohibits Pervis and Pauley (but not Shrager) from "representing clients or companies in the entertainment business" within a 100–mile radius of the People Store during the "term of this Agreement or for a period of two (2) years thereafter". The Shareholder Agreement excludes certain talent from the non-compete provision because they were existing clients of Pervis and Pauley. It states that the parties acknowledge and agree "that the 'California clients' listed on Exhibit A are the sole clients of JB Entertainment Group." (The talent identified on Exhibit A to the Shareholder Agreement is referred to as "Exhibit A Talent".)

The Exhibit A Talent includes Dakota Fanning and forms the basis of Ms. Pauley's claim in this case.

Shortly after the combination with the People Store, it was decided Pervis would maintain the books of HSK. She had a debit card for the HSK bank account, and she carried an HSK American Express card on which she was also personally liable. The People Store office was located a substantial distance from Pervis' home, and she wanted to work primarily from home. Shrager and Pauley agreed, and Pervis maintained a home office for HSK from 2002, until November 2005 when Pervis opened an HSK office on Pike Street. She increased the size of the office there in May 2006.

From time to time, Pervis made efforts to restructure the arrangement among Shrager, Pauley and herself, none of which were acceptable to Pauley or Shrager. In late 2004 or early 2005, Pervis told Pauley there would be no further commissions coming from Osbrink. Pervis reported that Osbrink had said a mother agency agreement should not last longer than three years and they had already paid more than three years on all of the Exhibit A Talent. It was Pauley's belief that the mother agency agreement had no ending date. So Pauley asked questions about the representation and went so far as to telephone Osbrink to verify that the information was correct. Scott Wine told Pauley the mother agency agreement with Osbrink had expired and Osbrink would no longer pay 3% commissions to Pauley or Pervis. Pauley asserts she did not receive any further commissions on Exhibit A Talent after mid–2004. As discussed more thoroughly in the Summary Judgment Order, the Second Exhibit A Talent account was not closed until March 2005, the account contained additional commissions paid on Exhibit A Talent, and Pauley re-

ceived checks from that account in October 2004, December 2004 and March 2005. After the closure of the Second Exhibit A Talent account on March 18, 2005, however, Ms. Pauley received no further commissions on Exhibit A Talent from Pervis or Osbrink.

Despite the representation that the mother agency agreement had terminated, Osbrink paid Pervis personally and then Joy Pervis Inc. ("JPI") dollar amounts equaling 3% of the amounts earned by the Exhibit A Talent. JPI is owned 100% by Pervis. Osbrink and Pervis contend that, after the termination of the mother agency agreement, Pervis became a part of the Osbrink "management team" for the Exhibit A Talent and certain other talent not listed on Exhibit A ("Non–Exhibit A Talent"). Pervis' activities, particularly on behalf of Dakota Fanning, ramped up substantially in 2005 and beyond. For the period 2005 through 2011, Ms. Pervis spent more and more time with Dakota Fanning and her family. Her work included reading over 75 scripts and discussing them with Osbrink and the Fanning family, acting as guardian for Dakota Fanning in North Carolina for four days, traveling with Dakota Fanning to Budapest and Paris, traveling with Dakota Fanning for appearances at talk shows, making efforts and contacts with respect to the funding of certain projects, and handling various press issues, as well as generally being available as support for the Fanning family. Pervis and Osbrink describe this role as Pervis serving on a "management team" for Dakota Fanning and allege this new role began in early 2005. Based on Plaintiff's Exhibit 54, the amount paid to Pervis as part of the management team for Dakota Fanning was over $268,000. Additionally, Osbrink paid almost another $20,000 to Pervis for allegedly serving on the management team of other Exhibit A Talent. Ms. Pauley claims these funds were all a

continuation of the mother agency commissions and should be split with her such that she is owed $144,123.21.

Prior to 2005, Osbrink had paid a 3% mother agency commission on Non–Exhibit A Talent to HSK at Pervis' direction. In early 2005, Osbrink took the position that the mother agency agreements with respect to Non–Exhibit A Talent also terminated. As with the Exhibit A Talent, though, Osbrink continued to pay a dollar amount equal to a 3% commission to Pervis or JPI on kids that had previously been denoted as HSK talent. Pervis and Osbrink took the position that Pervis was being paid for her services on the management team as opposed to a mother agency fee. Osbrink took Pervis' direction as to whom to make out the checks because Osbrink's relationship was with Pervis and not Pauley or Shrager.

In the meantime, Jayme Osburn ("Jayme"), the girlfriend of one of Pervis' sons, had become an intern with HSK in 2004. Pervis made Jayme a talent agent in 2006. Pervis continued her efforts to buy out or restructure the arrangement with Pauley and Shrager, none of which were successful. When Shrager and Pauley named their price as $90,000 for Pervis to buy them out of HSK, Pervis determined she would need to leave the company. When it became clear that Pervis would be leaving HSK, Jayme (who by then was engaged to Pervis' son) and Pervis' husband Jack formed a new company, JPTA, effective August 7, 2007. Jack Pervis owned 95% of the company, although he had no experience in the business, and Jayme owned 5%. On June 25, 2007, Jayme tendered her resignation from HSK to Pervis. Pervis did not inform either Shrager or Pauley of Jayme's resignation. On July 16, 2007, Pervis transferred her 40% interest in HSK to her son, Shaun (who was not the son engaged to Jayme).

On July 19, 2007, Pervis tendered both her own and Jayme's resignation letters to Pauley and Shrager. Pervis' resignation was effective August 1, 2007, but she did no further work for HSK after July 19, 2007 at Pauley's and Shrager's insistence.

On July 21, 2007, Pervis sent a letter to HSK's clients informing them of her departure from HSK. Pervis' letter to the clients informed the talent that Pervis would no longer be working as an agent for HSK and advised talent that they could remain with HSK or, since they were under no contract with HSK, seek other representation. The letter provided a list of other "reputable agencies that specialize in kids and teens" and the list included JPTA. The letter identified Jayme as the contact for JPTA. In three places, the letter instructed the talent to contact Shrager or Pauley. Shrager and Pauley estimated HSK lost 98% of its child and teen business, ranging from 125–154 clients, but there was no direct or admissible evidence of the number of kids who moved from HSK to JPTA. During this same time period, JPTA invoiced some businesses for work performed by child talent which had previously been HSK talent and then became JPTA talent. Upon challenge by HSK, though, JPTA reversed that billing on all accounts except the Vienna Sausage account (which will be discussed in more detail below). HSK received payment on all accounts except the Vienna Sausage one.

The Debtor was not identified as an officer or director or incorporator of JPTA. The Debtor testified that Jayme wanted to establish the company as a place for her to work after the Debtor's departure from HSK. After her resignation from HSK, the Debtor testified she did not work for JPTA. However, when Jayme was out of town, the Debtor "helped out" at the office by answering the phone. She

also wrote rent checks on JPTA's account and she loaned money to JPTA on at least one occasion that was not repaid. The JPTA office was also located in the Pike Street building where HSK had been located.

Needless to say, when Pervis left, the parting was not pleasant. She did, however, turn over the Quick Books records that she had been responsible for at HSK. When Pauley and Shrager reviewed the Quick Books, they noted numerous entries they contended represented unauthorized withdrawals of HSK funds for Pervis' personal expenses. Pervis claimed she had an "allowance" not restricted by actual expenditures. This is addressed below. Shrager and Pauley also believed Pervis was violating the non-compete provision of the Shareholder Agreement by helping start JPTA and by directing child talent to Osbrink rather than to HSK. Additional facts related to JPTA and Osbrink are discussed below. Ultimately, suit was filed in state court, and then Pervis filed this bankruptcy case to stay the state court law suit.

## CONCLUSIONS OF LAW

### Pauley's Exhibit A Talent Claim

Pauley claims a 50% share of the funds paid by Osbrink to the Debtor or her company on Exhibit A Talent. Pauley alleges the funds paid Pervis were the same mother agency commissions Osbrink had always paid, while Pervis claims the funds were for her work on the management team of the talent. Pauley alleges Pervis breached the agreement with Pauley, converted Pauley's funds and defrauded Pauley.

#### Nature of Agreement

■ In order to determine if Pauley has a claim based on the Exhibit A Talent, the Court must determine (i) what the agreement was with Osbrink; (ii) what the agreement was between Pauley and Pervis; and (iii) whether the payments from Osbrink on the Exhibit A talent were funds to be shared pursuant to that agreement.

Although there was testimony that the only specific agreement with Osbrink to pay a mother agency fee was with respect to Dakota Fanning, Osbrink paid a mother agency commission to JBE on all of the Exhibit A Talent. This is evidenced by Osbrink's own ledger of payments made (see Ex. 48). So, despite testimony to the contrary, the Court finds Osbrink did agree, either expressly or through a pattern and practice, to pay a mother agency commission on the Exhibit A Talent.

With respect to Pauley and Pervis, the Court finds that the agreement was to share all payments from Osbrink on a 50/50 basis. Frankly, Pauley and Pervis had little discussion about their agreement beyond this point. The Court finds Pauley and Pervis expected the money to come in as long as their Exhibit A Talent was represented by Osbrink. Neither anticipated substantial extra work to be done, expenses, or a change in the nature of the arrangement with Osbrink. Pauley and Pervis were friends, trusted each other, and enjoyed the fruits of their success together.

The Court finds the payments made by Osbrink on Exhibit A Talent were funds to be shared with Pauley. While Pervis and the Osbrink representatives all testified to a "management team concept", the remaining evidence convinces the Court that the payments made to Pervis or her company on Exhibit A Talent remain subject to division with Pauley. First, the Court notes there was no break in payments from the time when the mother agency commission allegedly stopped and the management team payments allegedly began and there appears to be no distinc-

tion as to the jobs for which payments were made. For example, a mother agency commission would continue regardless of when the actual job was performed, so that if the employer of the talent continued to make payments over a period of years Osbrink would continue to share in those commissions and presumably share its commissions with Pervis and Pauley under the mother agency agreement. The management team concept was based on the work Pervis was expected to do to support Osbrink and the talent she referred to Osbrink. One would think the management team payments would only be for jobs occurring after she became part of the management team and not for jobs which occurred before she came onto the management team. Second, Scott Wine and Angela Strange of Osbrink, both testified Pervis was the only non-Osbrink employee on a "management team" at Osbrink. Finally, there was virtually no testimony about the tasks Ms. Pervis performed for any of the talent identified on Exhibit A other than Dakota Fanning.

The Court concludes the change in designation of the compensation from commission to management team did not change the nature of the compensation or the nature of the obligation Pervis had to share that compensation with Pauley. This is distinguishable from whether Osbrink had an obligation to pay the mother agency commissions at all. Had Osbrink stopped paying completely on all the mother agency agreements, the Court expresses no opinion as to whether Osbrink would have had any liability for that termination. The Court only concludes that the payments that continued to be made from Osbrink fit within the confines of the agreements and expectations between Pauley and Pervis for the sharing of payments from Osbrink on Exhibit A Talent.

Pervis argued that the time she devoted to Dakota Fanning was significantly more than what would be expected of a referring agent and she paid all her own expenses. There is no doubt that Dakota Fanning was the most successful of the Exhibit A Talent. The Court finds it believable that Osbrink asked Pervis to step up her efforts and help with Dakota Fanning and her family. The Court believes that Pervis read the scripts, travelled extensively, acted as a guardian, searched for financing and generally interacted with the Fanning family and Osbrink in furtherance of Miss Fanning's career. The Court also believes these activities changed dramatically from what was originally contemplated by the parties in 2000 when Miss Fanning was first referred to Osbrink. At the same time, though, reading scripts, travelling, assisting the family and facilitating the careers of the talent are clearly within the role of a talent agent. Despite the designation of "management team", there seems to be no dispute that Pervis was not Dakota Fanning's "manager". The actions she took to facilitate and further Dakota Fanning's career were also in furtherance of hers and Pauley's best interests. It is in the referring agent's best interest to do everything possible to insure her talent is getting good jobs in Los Angeles, and is satisfied with the California talent agency that is paying the mother agency commissions. So while Pervis' actions with respect to Dakota Fanning definitely increased, and were very valuable to Osbrink, the Fannings and to Pauley, the payment from Osbrink was nevertheless still a fund to be shared with Pauley.

Pervis testified that HSK did not pay the expenses she incurred in working with Miss Fanning and neither did Osbrink. Nevertheless, there was no testimony as to the amount of expenses Pervis paid in support of Dakota Fanning. So while it

may have been appropriate and in keeping with the original agreement between Pauley and Pervis for Pervis to have subtracted her expenses from the funds from Osbrink before dividing them with Pauley, the Court received no evidence upon which it could make this calculation.

*Liability*

As noted in the Court's Summary Judgment Order, the statute of limitations on Pauley's Exhibit A Talent claims is four years and any claim arising prior to June 20, 2005 is barred. The Court left open the question of whether the statute of limitations was tolled for commissions received by Pervis or JPI but not deposited in the Second Exhibit A Talent Account (as identified in the Summary Judgment Order) by Pervis' fraud. The next question before the Court, then, is whether funds paid on Exhibit A Talent after March 18, 2005, when the Second Exhibit A Talent Account was closed, and before June 20, 2005 (when the statute of limitations does not prohibit the suit) can be recovered.

 Pauley has argued the statute of limitations was tolled until discovery of Pervis' alleged fraud pursuant to O.C.G.A. § 9–3–96. Courts have interpreted "discovery" to mean when "the actual fraud is discovered or by reasonable diligence should have been discovered." *Owen v. Mobley Construction Co., Inc.*, 171 Ga. App. 462, 320 S.E.2d 255 (1984) (cites omitted). "Mere ignorance of the facts constituting a cause of action does not prevent the running of the statute of limitations". *Gerald v. Doran*, 169 Ga.App. 22, 23, 311 S.E.2d 225 (1983). If there is sufficient notice, then it is the plaintiff's onus to exercise diligence to discover fraud. *Owen*, 171 Ga.App. at 462, 320 S.E.2d 255; *Stricker v. Epstein*, 213 Ga.App. 226, 229, 444 S.E.2d 91 (1994) (no tolling when shareholders and purchasers of securities stopped receiving monthly checks but

failed to exercise right to inspect books of corporation). A plaintiff cannot seek to toll the statute of limitations simply because it did not make the actual discovery until recently. *See Jones v. Bd. of Regents of Univ. Sys. of Ga.*, 219 Ga.App. 448, 449, 466 S.E.2d 869 (1995); *see also Bauer v. Weeks*, 267 Ga.App. 617, 619, 600 S.E.2d 700 (2004) (no tolling when homeowner knew something was amiss but avoided bringing action to discover the problem).

 While the Court found in the Summary Judgment Order that Pauley had reason to investigate the source of the funds in the Second Exhibit A Talent Account, there is no evidence of anything that would have caused Pauley to suspect that Osbrink continued to make payments on the Exhibit A Talent directly to Pervis or her company. Pauley not only asked Pervis several times to verify there were no payments being received from Osbrink, she spoke directly to Scott Wine and Cindy Osbrink to confirm Pervis' statement that Osbrink was making no more mother agency commission payments. She was told there would be no further mother agency commissions. Since she had no reason to believe that payments from Osbrink were continuing and no reason to believe there was another account into which money was being deposited, the Court finds the statute of limitations was tolled and Pauley may include in her Exhibit A Talent claim payments made by Osbrink to Pervis and to JPI prior to June 20, 2005, but after March 18, 2005.

In calculating damages, Pauley relied on Plaintiff's Exhibit 54, which is a summary based on Plaintiff's Exhibit 48 (the Osbrink ledger) of Osbrink payments on Exhibit A Talent. Pauley may not include payments that were voided by Osbrink or payments to HSK before March 18, 2005 as she produced no evidence that the payments were deposited anywhere other

than the Second Exhibit A Talent Account, which was in HSK's name. Pauley's damages consist of unvoided payments made by Osbrink to Pervis or JPI from March 19, 2005 forward. With these adjustments, the total amount paid by Osbrink to Pervis or JPI on Exhibit A Talent was $274,188.29, 50% of which is $137,094.15 which is owed to Pauley for breach of her agreement with Pervis.[3]

 Pauley also claims that Pervis' retention of Pauley's share of the Exhibit A Talent funds constitutes conversion. Conversion is the deprivation of possession of property. O.C.G.A. § 51–10–1. It occurs through the exercise of dominion over the personal property of another, in hostility to his rights. *Parris Props., LLC v. Nichols,* 305 Ga.App. 734, 744–45, 700 S.E.2d 848 (2010) (cites omitted). A prima facie case for conversion requires (1) title to the property; (2) possession by the defendants; (3) demand for possession; and (4) refusal to surrender property. *Taylor v. Powertel, Inc.,* 250 Ga.App. 356, 358, 551 S.E.2d 765 (2001). Although the statute refers to "personalty," the tort embodies the common law action of trover, and therefore applies to specific money as well, when the money is identifiable or traceable. *See Decatur Auto Ctr. v. Wachovia Bank, N.A.,* 276 Ga. 817, 583 S.E.2d 6 (2003); *Grant v. Newsome,* 201 Ga.App. 710, 411 S.E.2d 796 (1991). Pauley has proven her claim of conversion. As discussed above, Pauley is entitled to $137,094.15 of the payments made by Osbrink. Pervis received it, held it, and spent it. Pauley demanded the money, and Pervis has refused to return it. Therefore, Pervis is liable to Pauley for conversion in the amount of $137,094.15.

 Finally, Pauley alleges the actions of Pervis constitute fraud. To prove fraud under Georgia law, a plaintiff must establish five elements: (1) the defendant made a false representation or omission of a material fact; (2) the defendant had knowledge the misrepresentation was false at the time of making it; (3) the defendant deceptively intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered damages as a result of his reliance. O.C.G.A. § 51–6–2; *Home Depot U.S.A., Inc. v. Wabash Nat. Corp.,* 314 Ga.App. 360, 367, 724 S.E.2d 53 (2012) (cites omitted).

 The Court concludes that Pervis made representations that no further commissions would be paid from Osbrink to which Pauley would be entitled and that this representation was false. Pervis made this representation several times. Pauley noted the work Pervis was doing with Miss Fanning and asked Pervis if she was receiving any money. She answered no. Pervis testified she said that so as not to hurt Pauley's feelings. Pervis knew the representation was false because she knew she would be continuing to receive the commissions. Even if Pervis did not expect to receive the commissions initially, as she testified, Pauley asked the question about money from Osbrink repeatedly over the course of several years. Each time, Pervis answered no, which was false, and she knew it was false. The Court concludes Pervis acted deceptively as evidenced by the fact she made the representation not once but multiple times. Pauley's reliance on Pervis' statements was justified and reasonable. She asked questions several times of Pervis; most impor-

**3.** Exhibit 54 does not contain any summary of payments on Raven Symone's work. The Court has examined Exhibit 48, on which Exhibit 54 was based, and finds only two entries for Raven Symone in the relevant time period and made payable to Pervis in the amount of $1,500.00, so includes that amount.

tantly, she asked Scott Wine and Cindy Osbrink, and both told her the commissions had ceased. Therefore, her belief was reasonable and justified. As a result of her reliance on the false representation, she suffered damages of $137,094.15.

*Dischargeability*

Exceptions to discharge are to be strictly construed, and the burden is on the creditor to prove the exception by a preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 677 (11th Cir.1993).

Under Section 523(a)(2)(A) of the Bankruptcy Code, a debt is non-dischargeable if it is "for money, property, services or an extension, renewal or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The Court has already found the Debtor is liable to Pauley for fraud, and like Section 523(a)(2)(A) the Georgia standard requires a showing of "justifiable" reliance. The justifiable reliance standard is an individual standard that requires examination of the surrounding circumstances and the qualities of the particular plaintiff. *Field v. Mans*, 516 U.S. 59, 60, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Court reiterates its findings above with respect to state law fraud. The Court therefore finds the entire amount of Pauley's Exhibit A Talent claim non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

The Court also finds the debt non-dischargeable under 11 U.S.C. § 523(a)(4) as embezzlement. Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted or into whose hands it has lawfully come. *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 516 (Bankr.M.D.Ga. 2002). To establish embezzlement, the plaintiff must show (1) property owned by another which is rightfully in the possession of the debtor; (2) the debtor appropriates the property for personal use; (3) the appropriation occurred with fraudulent intent or by deceit. *See Sandalon v. Cook (In re Cook)*, 141 B.R. 777, 782 (Bankr. M.D.Ga.1992); *KMK Factoring, LLC v. McKnew (In re McKnew)*, 270 B.R. 593, 631 (Bankr.E.D.Va.2001); *U–Save Auto Rental of Am. v. Mickens (In re Mickens)*, 312 B.R. 666, 680 (Bankr.N.D.Cal.2004).

The commissions were rightfully in the possession of Pervis as the arrangement between Pauley and Pervis was that Pervis would receive the funds from Osbrink and then share the funds with Pauley. It is also undisputed that Pervis used the money for her own personal benefit. The funds were deposited either in her personal bank account or that of her company, JPI, and the funds were never used for anything of benefit to Pauley. The Court next must determine if the appropriation was made with fraudulent intent or under circumstances indicating fraud. "An intent to defraud is defined as 'an intention to deceive another person, and to induce such other person, in reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation or power with reference to property.'" *In re Cook*, 141 B.R. at 781. The Court is to take into consideration all the circumstances in order to make a determination of intent to defraud. Moreover, "[i]ntent is the state of mind which may be interpreted by the conduct of the person implicated." *Id.* at 783.

The Court concludes that Pauley's funds were converted by Pervis with fraudulent intent. As discussed above, the commissions were made payable to Pervis

individually and to her company, JPI, and were never deposited in any account to which Pauley had access. The continuing nature of the affirmative misrepresentation about receipt of funds from Osbrink is further evidence of the Debtor's fraudulent intent. It is clear to the Court that Pervis did not intend Pauley to know that she was continuing to receive money on the Exhibit A Talent and she continued to mislead Pauley as she asked follow-up questions. Concealment is frequently used by the courts as evidence of fraudulent intent. *See In re Cook,* 141 B.R. at 784 (stating debtor lied to plaintiff about the location of the property which was evidence of the debtor's fraudulent intent); *In re McKnew,* 270 B.R. at 633 (stating debtor concealed his removal of excessive compensation providing false and misleading financial information to the other members of the LLC, which actions of concealment further buttress the debtor's fraudulent intent); *King v. Spivey (In re Spivey),* 2010 WL 3980132 (Bankr.E.D.Tenn. Oct. 7, 2010) (stating managing member's use of company funds for other projects and for personal use without authorization or knowledge of the plaintiffs, is embezzlement); *Murray v. Woodman (In re Woodman),* 451 B.R. 31 (Bankr.D.Idaho 2011) (stating debtors falsely assured investors of return of funds after used for inappropriate purpose); *see also In re Wright,* 282 B.R. at 516–17 (distinguishing *Cook* because debtor in the *Wright* case did not conceal or lie about the disposition of the property).

The Court recognizes that Pervis performed significant services for Dakota Fanning and for Osbrink, and that without her services there is some chance Miss Fanning would have left Osbrink and the mother agency commissions would have ceased. The Court can appreciate Pervis' sense that, because she was doing all the work, she should receive all the funds.

That frustration, though, does not justify breaching an agreement with your partner and then lying about it. The Court concludes that Pervis did convert the funds with fraudulent intent and thus that all the elements of embezzlement as defined under 11 U.S.C. § 523(a)(4) have been established.

### HSK Claim for Payments from Osbrink for Non–Exhibit A Talent

While Pauley claims a share of the funds paid by Osbrink to the Debtor on talent identified on Exhibit A, HSK claims it is entitled to funds paid by Osbrink to the Debtor on any child talent not identified on Exhibit A. HSK relies on Plaintiff's Exhibit 55a, which is based on the Osbrink ledger identified as Exhibit 48, as evidence of the Non–Exhibit A Talent for which Osbrink paid Pervis or her company. HSK contends that the Debtor tortiously interfered with the business of HSK and converted funds that rightfully belonged to HSK because the fees were proceeds of HSK opportunities.

HSK originally claimed damages of $74,813.89 based on Exhibit 55a. Upon cross examination, it became clear that neither Shrager nor Pauley were very familiar with the child talent business of HSK and neither knew many of the talent listed on Plaintiffs' Exhibit 55a. In many instances, HSK presented no evidence of the relationship between the talent and HSK, where the talent lived, or where the talent worked. As a result, Shrager deleted nine names from the list of Non–Exhibit A Talent and reduced HSK's claim to $73,628.73. Shrager's calculation of this claim is based exclusively on the fact that Osbrink made a payment to the Debtor or her company. HSK's theory is—Pervis received it; it must be ours.

The Debtor disputes that HSK was entitled to any of the funds paid by Osbrink on

the basis that the funds were management team fees and not a mother agency commission. Moreover, the Debtor points out that a number of the talent identified on Plaintiff's Exhibit 55a had left HSK at the time of the Osbrink payment, or physically moved to California, or were adults, or were never related to HSK in any way. She contends HSK would not be entitled to funds for that talent.

Under the theories of tortious interference or conversion or usurpation of corporate opportunities, the Court must first determine who was entitled to the money paid by Osbrink on the Non–Exhibit A Talent, and the determination must be made on a child-by-child basis. Entitlement to the Osbrink payments could be based on an agreement between HSK and Osbrink, or because the payments represented proceeds of a corporate opportunity of HSK, or because the Debtor was not permitted by the Shareholder Agreement to engage in the activity.

*Agreement*

The Debtor disputes there was ever an agreement between HSK and Osbrink to pay a mother agency fee to HSK. Pauley, on the other hand, testified that the arrangement Osbrink made with respect to Dakota Fanning applied equally to all other kids placed with Osbrink, including those placed by HSK. The evidence shows that, prior to 2005, Osbrink made payments on Non–Exhibit A Talent to HSK, which is consistent with industry practice. There was no express agreement to pay a commission to HSK, but, as discussed below, HSK had a corporate opportunity to obtain a commission by referring talent to a California agent.

*Corporate Opportunity*

▮ Determining if an HSK corporate opportunity was taken by Pervis involves a two-part inquiry: (1) whether the appropriated opportunity rightfully belonged to HSK; and (2) whether Pervis violated a fiduciary duty in appropriating the opportunity. *SE Consultants, Inc. v. McCrary Eng'g Corp.*, 246 Ga. 503, 508, 273 S.E.2d 112 (1980). The test for determining a corporate opportunity varies depending on whether the defendant is an existing or former officer or director. Pervis is an *existing* officer with respect to referrals made to Osbrink prior to her resignation from the company on July 19, 2007, and a *former* officer with respect to referrals made after that date. Where the opportunity arose pre-resignation, the determination of whether an opportunity rightfully belonged to HSK is accomplished through the "line of business test" which evaluates whether an activity is "intimately or closely associated with the existing or prospective activities of the corporation." *Id.; Quinn v. Cardiovascular Physicians, P.C.*, 254 Ga. 216, 218, 326 S.E.2d 460 (1985). As such, an opportunity will be deemed to rightfully belong to HSK if it is an opportunity that (a) HSK could financially undertake; (b) is in HSK's line of business and of practical advantage to it; (c) in which HSK has a reasonable expectancy; and (d) if taken by Pervis, would bring her self-interest into conflict with that of HSK. *Brewer v. Insight Tech., Inc.*, 301 Ga.App. 694, 696, 689 S.E.2d 330 (2009); *Parks v. Multimedia Tech., Inc.*, 239 Ga.App. 282, 288–89, 520 S.E.2d 517 (1999). With respect to opportunities after the Debtor resigned from HSK, and she is therefore a former officer, the question of whether an opportunity rightfully belonged to the corporation is accomplished through the "interest or expectancy" test. It identifies a business opportunity as one that arises from a "beachhead" consisting of a legal or equitable interest or an "expectancy" growing out of a pre-existing right or relationship. *United Seal & Rubber Co., Inc. v. Bunt-*

*ing,* 248 Ga. 814, 815, 285 S.E.2d 721 (1982). A past relationship with customers alone is insufficient to create a reasonable expectancy absent a contractual agreement, an "exclusive arrangement" or a "finite aspect". *Id.; Ins. Indus. Consultants, LLC v. Alford,* 294 Ga.App. 747, 751, 669 S.E.2d 724 (2008) (no usurpation when clients were prospective or had to annually renew contracts). "[T]he opportunity of dealing with certain customers [does] not constitute a business opportunity." *Alford,* 294 Ga.App. at 751, 669 S.E.2d 724. As one court has explained,

> The fact that [plaintiff] had established business relationships with its customers does not amount to the establishment of a "beachhead" that would make those relationships a corporate opportunity. In this regard, [plaintiff] may well have had an "interest" in keeping its customers or an "expectancy" that customers would continue to use its services in the sense that it anticipated they would. But nothing precluded any competitor from taking a customer away from [plaintiff] by proposing to provide services for less money or by convincing a customer that it could provide better service.

*Lou Robustelli Mktg. Servs., Inc. v. Robustelli (In re Robustelli),* 430 B.R. 709, 729 (Bankr.N.D.Ga.2010).

■■■■ Once it is established that an appropriated opportunity rightfully belonged to the corporation, the next inquiry is whether the corporate official violated a fiduciary duty in appropriating the opportunity. When the business opportunity is a relationship with a customer, solicitation by a current officer for the officer's new business venture may be a violation of the officer's fiduciary duty because it would be in direct competition with the corporation. *Keg Techs., Inc. v. Laimer,* 436 F.Supp.2d

1364, 1376 (N.D.Ga.2006); *Brewer,* 301 Ga. App. at 696–97, 689 S.E.2d 330. "[S]imply making plans" to start a competing company while still employed by the corporation does not constitute a breach of fiduciary duty. *Keg,* 436 F.Supp.2d at 1376 (finding no breach until active solicitation of business for competing enterprise); *Instrument Repair Serv., Inc. v. Gunby,* 238 Ga.App. 138, 518 S.E.2d 161 (1999) (holding likewise). No breach occurs if the officer specifically informs the corporation of the new business opportunities and the corporation declines to take them. *Gunby,* 238 Ga.App. at 141, 518 S.E.2d 161.

The Debtor tendered her letter of resignation to HSK on July 19, 2007, and suggested the resignation be effective August 1, 2007. The Court finds, though, the Debtor did no further work for HSK after July 19, 2007, as neither Shrager nor Pauley wanted her involved in any way. The Court has already granted summary judgment to Pervis on all post-resignation opportunities. HSK had no beachhead or expectancy in post-resignation opportunities since the talent did not have exclusive or finite agreements with HSK.

The talent identified on Exhibit 55a falls into three categories. First, there are two children where the payments claimed by HSK were made entirely pre-resignation. Commissions on behalf of C. Capobionca and N. Smith in amounts of $2.01 and $84.10 were made by Osbrink to Pervis while she was the president of HSK. The Debtor acknowledged those funds should have been paid to HSK, and the Debtor is therefore liable for those payments totaling $86.11.

Next, there are 11 children where the payments by Osbrink occurred exclusively after the Debtor's resignation from HSK.[4]

---

**4.** The Debtor received a payment of $4.56 on behalf of H. Knight in a check dated Septem-

Since these opportunities arose after the Debtor's resignation, the Court's Summary Judgment Order is confirmed and HSK has no claim arising from them. HSK presented no evidence that these kids had previously been HSK talent or that HSK had any expectation at all of receiving funds for the work the kids performed for Osbrink after Pervis' resignation from HSK. The Court finds the Debtor is not liable to HSK for any of the payments made by Osbrink on behalf of these children.

■ Finally, there are four children identified on Plaintiff's Exhibit 55a where Osbrink paid Pervis both pre-resignation and post-resignation. Just as with the Exhibit A Talent, the Debtor testified that, in early 2005, Osbrink stated it would pay no more mother agency commissions and instead was shifting to the management team concept. In the context of Exhibit A Talent, the reason Osbrink gave for discontinuing the mother agency agreement was that it had already paid for more than three years, which was the standard term. It is unclear from the evidence why Osbrink would not have paid a mother agency agreement on new talent placed with Osbrink by HSK or anyone else, or why it would have paid any such commission for less than three years. Nevertheless, beginning in early 2005, Osbrink made payments to the Debtor individually and to her company, JPI, in amounts which mathematically equal 3% commission on the talents' earnings. Each of the talent in the category will be reviewed below.

*C. Ford.* Plaintiff's Exhibit 55a reflects payments by Osbrink to Pervis and JPI on behalf of C. Ford from June 21, 2006 to February 28, 2011. The testimony was that C. Ford had been HSK talent who Pervis discovered when he was five years old. He left HSK in 2005 to move to Los Angeles. The Debtor then referred him to Osbrink and she was placed on his management team. Plaintiffs' Exhibit 48 reflects the first check from Osbrink for C. Ford's work was dated April 14, 2005.

Despite these facts, the Court concludes that funds paid by Osbrink as a result of work done by C. Ford was a corporate opportunity of HSK. HSK had an unbroken history with C. Ford. The referral of C. Ford to an agency in California and the receipt of a mother agency commission was an opportunity HSK could financially undertake. Since C. Ford was child talent, the referral of him to a California talent agency was within HSK's line of business and of advantage to it. HSK had a reasonable expectancy that the referral would be made for the benefit of HSK because C. Ford had a history of having been a HSK client, and because the referring party was the president of HSK. There is no satisfactory explanation as to why Osbrink would not pay a mother agency commission on new referrals (as opposed to the Exhibit A Talent where a three-year "term" allegedly had expired) and the testimony from others in the industry was that it was typical for a California talent agency to pay the referring talent agent a commission. Even after Pervis resigned from HSK, HSK had a legal expectation and a beachhead in commissions earned on C. Ford at least for a term of three years which the Court finds

ber 27, 2006, which is pre-resignation. However, the undisputed testimony was that Knight was an adult living in L.A. Therefore, even under the pre-resignation corporate opportunity analysis, HSK had no expectation of payment of that sum. HSK was in the business of placing child talent, not adult talent, and the talent was located in Los Angeles, not in the Atlanta metropolitan area. There was no evidence presented that H. Knight had any relationship with HSK prior to September 27, 2006.

was the usual term of Osbrink's mother agency agreements.

Pervis violated her fiduciary duty as an officer of HSK. Rather than making an agreement with Osbrink for a mother agency commission on the referral of C. Ford, or referring him to an agency where HSK could have received a mother agency commission, the Debtor chose to refer him in such a way that only she could receive the money. The Court finds this brings the Debtor's self-interest into conflict with that of HSK.

The Debtor contends Ford's change of residence to California meant HSK had no right to the funds. But a change in residency with some Exhibit A Talent did not terminate the mother agency commission and the Court concludes moving to California without more is not sufficient to terminate HSK's expectations of a commission for his work. The Court therefore finds the Debtor liable to HSK for all funds paid by Osbrink to her or to JPI for work done by C. Ford for three years from the date of the first check in April 2005, which totals $3,234.63.

*I. Fuhrman.* Checks were made payable by Osbrink to the Debtor and to her company from August 31, 2006 to December 10, 2009 for work performed by I. Fuhrman. Ms. Fuhrman was an HSK talent for a year or two before she moved to Los Angeles in 2005 and began working with Osbrink. The Debtor received the first checks in June 2006. The Court concludes HSK had every expectation the Debtor would place children with California agents in a way to receive a mother agency commission for the work they performed or, at a minimum, would not place them in such a way where only the Debtor could receive compensation for the work performed. As

such, the Court concludes that the Debtor is liable to HSK for the payments from Osbrink to her and her company for work done by I. Fuhrman for three years from the date of the first check in the total amount of $3,803.86.

*M. Ormsby.* Checks were made payable by Osbrink to the Debtor and her company for work done by M. Ormsby for a period from June 21, 2006 through November 16, 2011. Ormsby was a former HSK client who moved to California. HSK could financially undertake the referral of M. Ormsby to Osbrink or another California talent agency, and Ormsby, as a child, was in HSK's line of business and of advantage to it. HSK had a reasonable expectation that the fees received on behalf of his work would be paid to HSK, both because of his prior relationship with HSK and because of the standard of California agencies for paying mother agency commissions for talent referred to them. As such, Osbrink to her and JPI for work done by M. Ormsby for a period of three years from the date of the first check in the amount of $926.50.

*D. Gearhart.* The Debtor and her company received checks from Osbrink dated from October 25, 2006 through January 25, 2011 for work done by D. Gearhart. D. Gearhart was an HSK talent. In fact, Plaintiffs' Exhibit 48 (the Osbrink ledger) reflects payments of a mother agency commission from Osbrink to HSK in August 2004 for Gearhart's work. Pervis testified that Gearhart went to Los Angeles for a "pilot season"[5] but then returned to Atlanta. He continued working in Atlanta as an HSK talent. In late 2007, after Pervis resigned from HSK, Gearhart moved to Los Angeles and resumed his relationship with Osbrink. The Debtor contends she

---

**5.** "Pilot season" refers to the time period when pilot episodes for television shows are

being produced.

was on his management team at Osbrink. The Court concludes the checks for a three-year period beginning August 2004 represent proceeds of corporate opportunities of HSK because HSK could financially undertake the referral of Gearhart to Osbrink, and, as a child, he was in HSK's line of business. HSK had a reasonable expectation it would continue to receive the commissions for him given that it had received them in the past and had made the initial referral to Osbrink. As discussed above, Pervis changing the relationship to one called management team during this time period while she was an employee of HSK brings her self-interest into conflict with that HSK. The court finds the Debtor liable for $679.57 in commissions paid by Osbrink.

In sum then, the Court concludes $8,644.56 paid by Osbrink to the Debtor or her company was rightfully funds that should have been paid to HSK.

*Shareholder Agreement*

HSK alleges that the Debtor's collection of money from Osbrink on Non–Exhibit A Talent is a violation of Section 6.1 of the Shareholder Agreement. This section provides:

> The Original Shareholders [Debtor, Pauley and Shrager] acknowledge that the business of the representation of children in the entertainment business is the primary reason for the founding of the Company [HSK] and that all parties participating contribute specific and necessary expertise to the Company and that an additional reason for forming the business was the probability of gaining significant market dominance in the geographic area comprising a one hundred (100) mile radius from 2004 Rockledge Road, N.E., Atlanta, Georgia (the "Territory"). The Original Shareholders further acknowledge that Shrager is the principal in the business known as the

People Store Inc. which engages in the general representation of clients and companies in the entertainment business and that the People Store Inc. intends to expand its business in the Territory by acquisition or organic business growth. Neither Pervis nor Pauley, therefore, during the term of this Agreement or for a period of two (2) years thereafter shall engage directly or indirectly, whether as employee or through investment in any entity, in the business of representing clients or companies in the entertainment business within the Territory, *provided however*, that Pervis and Pauley may engage in such activities in the Territory during such timeframe (i) in conjunction with the activities of a talent manager, rather than a talent agent, where such activities involve the management of the careers of such talent clients rather than the direct placement of such clients in talent assignments in return for a commission for such placements . . .

■■■■■ "Before 2011, Georgia law disfavored restrictive covenants. *See Convergys Corp. v. Keener*, 276 Ga. 808, 582 S.E.2d 84, 85–86 (2003). Georgia's constitution also forbade the state's legislature, the General Assembly, from authorizing restrictive covenants. *See Jackson & Coker Inc. v. Hart*, 261 Ga. 371, 405 S.E.2d 253, 254 (1991)". *Becham v. Synthes USA*, 482 Fed.Appx. 387, 388 (11th Cir.2012). After the passage of a constitutional amendment, the General Assembly enacted O.C.G.A. §§ 13–8–51–13–8–59 which significantly changed the law on restrictive covenants. In particular, under the old law, if any portion of the restrictive covenant was invalid, the entire restrictive covenant was invalid. Under the new law, courts were given the authority to "blue pencil" or modify restrictive covenants to make them enforceable in certain situa-

tions. The new law became effective May 11, 2011, and applies only prospectively to contracts entered into after that date. *See Becham,* 482 Fed.Appx. at 389. Since the Shareholder Agreement at issue here is dated October 31, 2002, the validity of the noncompetition provision is governed by the "old" Georgia law.

Under the "old" Georgia law, contracts which tend to lessen competition or restrain trade are against public policy and are void. Ga. Const., Art. IV, Sec. IV, Para. i. Restrictive covenants are a partial restraint of trade and are enforceable "only if limited in time and territorial effect and [are] otherwise reasonable considering the business interests of the employer sought to be protected and the effect on the employee." *Fuller v. Kolb,* 238 Ga. 602, 603, 234 S.E.2d 517 (1977).

> [T]he first step in considering the enforceability of restrictive covenants is to determine the level of scrutiny to be applied. Georgia courts have traditionally divided restrictive covenants into two categories: "covenants ancillary to an employment contract which receive strict scrutiny and are not blue penciled, and covenants ancillary to a sale of [a] business, which receive much less scrutiny and may be blue penciled." ... Strict scrutiny requires a court to strike all covenants not to compete or solicit if one covenant is unenforceable.

*Wachovia Ins. Servs. Inc. v. Fallon,* 299 Ga.App. 440, 442, 682 S.E.2d 657 (2009) (cites omitted). Whether a non-compete provision is reasonable is a question of law for the court. "A three-element test of duration, territorial coverage, and scope of activity has evolved as a helpful tool in examining the reasonableness of the particular factual setting to which it is applied." *Id.; see also Beacon Sec. Tech., Inc. v. Beasley,* 286 Ga.App. 11, 12, 648 S.E.2d 440 (2007); *W.R. Grace & Co.,*

*Dearborn Div. v. Mouyal,* 262 Ga. 464, 422 S.E.2d 529 (1992). "A territorial limitation is necessary to give the employee notice of what constitutes a violation of the restrictive covenant.... In determining reasonableness, consideration must be given to the employee's right to earn a living and the employee's ability to determine with certainty the area within which his post-employment actions are restricted." *W.R. Grace,* 262 Ga. at 465–66, 422 S.E.2d 529. Courts "focus [ ] on the interplay between the territorial limitation and the scope of the prohibition.... A broad territorial limitation may be reasonable if the scope of prohibited behavior is sufficiently narrow." *Beacon,* 286 Ga.App. at 12–13, 648 S.E.2d 440. Although Plaintiff introduced testimony from Mike Siavage, the attorney who drafted the noncomplete provision, who opined it was enforceable, the task of determining enforceability is this Court's.

The parties seem to believe that Section 6.1 of the Shareholder Agreement prohibited the Debtor from competing with HSK for two years after her resignation. The Court notes, however, it is far from clear that non-competition with HSK is prohibited. Section 6.1 says the business of the company (HSK) is the "representation of children in the entertainment business". On the other hand, the business of the People Store is described as the "general representation of clients and companies in the entertainment business". What the Debtor is prohibited from doing is "representing clients or companies in the entertainment business"—a description which matches the People Store business, not the HSK business. The Court notes also that the non-compete provision represents that the People Store intends to expand its business in the territory and "neither Pervis nor Pauley, therefore, ..." shall compete. Shrager is not prohibited from competing with HSK. Shrager testi-

fied the non-compete provision was meant to protect *her* and keep the Debtor from competing with the *People Store*. It appears to the Court that Section 6.1 of the Shareholder Agreement prohibits Pauley and Pervis from competing with the People Store, not Pauley and Pervis from competing with HSK. The People Store is not a plaintiff and the People Store does not own an interest in HSK.

Even if the non-compete provision prohibited competition with HSK, the duration of the non-compete is not clear. The non-compete provision applies during the "term of this Agreement and for a period of two (2) years thereafter." The "term" is defined in Section 7.1. The Agreement terminates in three situations, none of which are applicable here:

(i) If all outstanding shares of HSK are owned by one shareholder;

(ii) If HSK files for bankruptcy, dissolves or the like;

(iii) If all shareholders agree to terminate the Agreement; or

(iv) Upon an initial public offering.

The agreement and the non-compete do not terminate upon the termination of Pervis' employment. The non-compete provision as written restricts Pervis' activities for open-ended years. She can do nothing to terminate the prohibition. Her partners exercise control over the termination of the Agreement and therefore the trigger of the two-year non-compete. Pervis is even treated differently from Pauley in the non-compete. Pauley may compete immediately if she is terminated without cause, but Pervis could not compete if she were terminated without cause. The open-ended nature of the duration of the non-compete and the fact the termination of the Agreement is not within Pervis' control make the duration unreasonable and the covenant unenforceable.

The definition of territory is clear—a 100–mile radius from 2004 Rockledge Road in Atlanta. Based on the testimony of the parties, that territory is not unreasonable. What is not clear, though, is the scope of the activity as it relates to the defined territory. The activity is described as "representing clients or companies in the entertainment business within the Territory". But does this mean that the job performed by the talent is within the territory; or that the talent resides in the territory at the time of the job; or that the talent was "discovered" in the territory; or that Pauley and Pervis cannot use their phones or residences in furtherance of a job for someone residing outside the territory and working outside the territory?

All parties agree that, if the job performed by the talent is located in the territory, it is covered by the non-compete. This understanding is also consistent with the testimony of Michael Stubbs and Michael Lynch, other agents in the business. The location of the job is critical in the entertainment business. The Debtor's actions in this case are consistent with her understanding that the location of the job dictated whether she could represent the talent. For example, when Colin Ford worked in Georgia, the Debtor paid HSK the money she received as his agent for that job. When Colin Ford worked in California, the Debtor took the position that she was not acting as his agent and HSK did not receive the money for that job. Focus on the job is also encompassed in Section 6.1 of the Shareholder Agreement itself. Section 6.1 permits Pervis and Pauley to engage in the activities of a talent manager "rather than a talent agent, where such activities involve the management of the careers of such talent clients *rather than the direct placement of such clients in talent assignments in return for a commission for such placements.*" (emphasis added). Clearly, the

primary job of the agent is to find jobs for the talent and then the agent receives a commission on the work earned by the talent in that job.

At the other extreme, HSK contends that, even if talent were located in California and worked in California but the Debtor used her telephone while sitting in Georgia to have a phone conversation with the talent, she is "representing clients in the entertainment business within the Territory". The Debtor, of course, disputes this interpretation. Such an interpretation would require the Debtor to move from her home in order to work. "In determining reasonableness, consideration must be given to the employee's right to earn a living." *W.R. Grace*, 262 Ga. at 466, 422 S.E.2d 529. HSK's interpretation is an unfair restraint of trade because it would functionally prohibit the Debtor from working in metropolitan Atlanta in any way. If HSK's interpretation is possible, the non-compete is invalid. The Georgia appellate courts have regularly struck down restrictive covenants if they could be interpreted in an invalid way, even though they may also be interpreted in a valid way. *See Wachovia Ins. Servs.*, 299 Ga. App. at 442, 682 S.E.2d 657, and *Beacon Sec. Tech.*, 286 Ga.App. at 12, 648 S.E.2d 440.

The Debtor argues that, if the talent is not a Georgia resident at the time the job is performed and the job is not located in the territory, the Debtor's representation of that talent is not prohibited. The Plaintiffs, of course, disagree. Just as HSK's position is overly broad, the Debtor's position is also too broad. As discussed above in connection with corporate opportunities, the evidence shows that a talent agent has the opportunity to make money through mother agency agreements even though the talent agent may not be an agent per se with respect to a particular job. Adopt-

ing the Debtor's interpretation would allow her to deprive HSK of mother agency commissions to which it would otherwise be entitled.

Given the vagueness of the non-compete provision, the overly broad description of what is prohibited, and the open-ended duration of the non-compete, the Court finds the non-compete provision to be unenforceable. The business of being a talent agent requires the agent to perform many tasks. In today's society where the location of residence, the location of the television or movie shoot, the location of an office, the location of a party making or receiving a phone call, and the location of a meeting can occur in a myriad of different places, the definition of representation as it relates to the territory is simply not specific enough to be enforced. Since the non-compete provision pre-dates the authority of a court to blue pencil or modify a non-compete provision to make it enforceable, the Court finds the entire non-compete provision to be invalid and to support no claim.

*Conversion of Non–Exhibit A Talent Payments from Osbrink*

The Court has found that $8,644.56 of the payments from Osbrink on the Non–Exhibit A Talent were rightfully funds of HSK because they were corporate opportunities of HSK. The Court has, therefore, found that HSK has title to the property. There is no dispute that the Debtor received the funds and that HSK demanded the funds be returned. The Debtor is therefore liable to the Plaintiff for conversion in the amount of $8,644.56.

*Liability for Tortious Interference with Respect to Payments from Osbrink on Non–Exhibit A Talent*

In the Summary Judgment Order, the Court ruled HSK had no claim for tortious interference with business for post-resignation activities, but reserved judgment on

liability for pre-resignation activities. As the Court stated in its earlier order, if it should determine that Pervis' actions violated her fiduciary duty, such a finding would provide a basis for finding that Pervis acted improperly and without privilege with respect to those relationships. The Court has found that Pervis violated her fiduciary duty with respect to corporate opportunities for the four children totaling $8,644.56 in payments.

As discussed at length in the Court's Summary Judgment Order, any alleged interference must be with a third party because a party cannot interfere with its own business relationships. The defendant must, therefore, be a "stranger" to both the contract and the business relationship giving rising to and underpinning the contract. Since Pervis had a relationship with Osbrink and the talent and HSK, she is not a stranger to the business relationship with which she is accused of interfering. She could not, therefore, be liable for tortious interference. Even if she were deemed to be a stranger because of the breach of her fiduciary duty in taking HSK opportunities, the calculation of damages would be the same as with conversion and usurpation of corporate opportunities.

*Non–Dischargeability*

 HSK asserts that its claim for conversion and usurpation of corporate opportunity is excepted from discharge under 11 U.S.C. § 523(a)(6). Section 523(a)(6) excepts from discharge "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The term "willful" means "intentional and deliberate". *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1263 (11th Cir.1988). The plaintiff must show that the debtor actually intended to do what the debtor is being accused of doing. *Commonwealth Land Title Ins. Co. v. Homer (In re Ho-*

*mer)*, 168 B.R. 790, 805 (Bankr.N.D.Ga. 1994). In *Kawaauhau v. Geiger*, the Supreme Court held that non-dischargeability under § 523(a)(6) requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). To establish a willful injury, the plaintiff must show that the debtor defendant had a subjective motive to inflict injury or believed his conduct was substantially certain to cause injury. *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir.2012); *Estate of Nelle Bowen Newton v. Lemmons (In re Lemmons)*, 2005 WL 6487216 (Bankr.N.D.Ga. Dec. 20, 2005) (citing Restatement (Second) of Torts § 8A; *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001); *Bank of Lumber City v. Rowland (In re Rowland)*, 316 B.R. 759, 763–64 (Bankr.S.D.Ga.2004)). "[T]he debtor's subjective intent in an action under section 523(a)(6) may be inferred from surrounding circumstances." *Allison v. Dean (In re Dean)*, 2013 WL 1498305 (Bankr. M.D.Ala. Apr. 10, 2013) (cites omitted).

 The term "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will." *Jennings*, 670 F.3d at 1334. Recklessness is insufficient to establish willfulness, but may be sufficient to establish malice, which can be implied or constructive. *Rebhan*, 842 F.2d at 1262–63. So, "a wrongful act done intentionally, which necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse is 'willful and malicious' within the meaning of section 523(a)(6)." *Kasper v. Turnage (In re Turnage)*, 460 B.R. 341, 346 (Bankr.N.D.Ga.2011).

 The Court concludes the Debtor's taking of the identified corporate opportu-

nities and converting the funds to her own use was willful and malicious. First, the Debtor actually intended to place the identified talent with Osbrink under the management team approach rather than with Osbrink through a mother agency commission arrangement or with another California agency in an arrangement where HSK could have received a mother agency commission. The Debtor intended to injure HSK, or at a minimum believed that her conduct was substantially certain to cause injury, because she arranged the transactions in such a way that she would personally receive the money, rather than the money going to the company that represented the children at the time the arrangement began. The Court also finds the Debtor's actions to be malicious. As stated above, hatred, spite or ill will is not required; but taking a corporate opportunity intentionally, knowing that, if the money were paid to the Debtor individually rather than HSK, HSK would be harmed, is willful and malicious within the meaning of Section 523(a)(6), and the Court finds the sum of $8,644.56 to be nondischargeable.

### Claims related to JPTA

HSK claims the creation of JPTA violated the Shareholder Agreement and that the Debtor, through JPTA, tortiously interfered with HSK's business by stealing talent and by billing Vienna Sausage for HSK talent.

The Court has previously ruled the noncompete provision of the Shareholder Agreement is unenforceable. The Court also ruled in its Summary Judgment Order that HSK has no claim for tortious interference with contracts, either pre- or post-resignation, and no claim for tortious interference with business relations for post-resignation activities.

Even if the Court had not already made those two determinations, the Court finds

that HSK's claims with respect to the formation of JPTA and its alleged stealing of talent fail fundamentally for lack of evidence. HSK presented no evidence as to the talent that left HSK and went to JPTA. HSK presented no evidence that this Debtor was involved in having any HSK talent retain JPTA prior to or after her resignation from HSK. The Court ruled in the Summary Judgment Order that Joy's Letter to Clients alone is insufficient to support a claim, and there was no other evidence of action the *Debtor* took. Effectively, HSK asks the Court to find the Debtor liable because it is suspicious that the Debtor's husband and future daughter-in-law set up a company to compete with HSK. While a family member setting up a company like JPTA is suspicious (and is the reason why this Court denied the Debtor's motion for summary judgment on this point), it is not proof that this Debtor took the actions that would make her liable. The testimony was consistent from Pauley and Shrager that, when they asked the Debtor questions about JPTA, she referred them to Jayme. Both Pauley and Shrager testified to conversations they had with Jayme (which are hearsay), but Jayme never testified. The Debtor testified she was not involved in setting up the website, or getting contacts from HSK. While there is smoke here, no fire was proven.

Even if the Court found sufficient evidence to conclude that the Debtor had tortiously interfered with HSK's business through actions of JPTA or Jayme, there was absolutely no evidence presented from which the Court could award any damages. There was no evidence of what JPTA received on behalf of former HSK talent; there was no evidence of profits HSK lost due to any departing HSK talent. There is simply no basis on which the Court can hold the Debtor liable for tortious interference related to JPTA's actions.

HSK claims it is entitled to $1,800.00 that was billed by JPTA to Vienna Sausage after Jayme and Pervis left HSK. On June 26, 2007, an e-mail was sent to Jayme by Annette Stillwell, who was casting child roles for a Vienna Sausage commercial. The e-mail was sent to Jayme's HSK account. Jayme had tendered her resignation the day before, but was still working at HSK. After Jayme received the e-mail, one or more HSK talent was sent to the casting call on June 27 and was hired for the job after Jayme left HSK. The job occurred after Jayme and Pervis left HSK. The Debtor testified on examination that she first learned of the Vienna Sausage job after she left HSK. While Pauley and Shrager testified that Jayme told them that Pervis told Jayme that she could have the account, that testimony is double-hearsay, Jayme was not present to testify or be questioned on the representation, and the Debtor denied the statement. Further, there is no evidence of the amount billed by JPTA on the Vienna Sausage account. Shrager only estimated that amount as $1,800. While the Court expresses no opinion on the propriety of Jayme's actions and therefore on JPTA's actions, HSK has not carried its burden of proof that the Debtor individually is responsible for Jayme's or JPTA's actions in billing for the Vienna Sausage account, or that the damages were $1,800. Thus, the Court finds for the Defendant with respect to all allegations regarding the formation of JPTA, the billing of the Vienna Sausage account, and the alleged "stealing" of talent from HSK.

### Conversion of HSK Funds Through Payment of Personal Expenses

Finally, HSK alleges that the Debtor converted HSK funds and used them for her personal expenses. In 2002, when HSK became affiliated with the People Store, there was no space for HSK's office at the main People Store office on Rockledge Road in Atlanta. Pervis did not want to drive from her home in Gwinnett County to intown Atlanta in any event. So the Debtor, Pauley and Shrager agreed the HSK office would be set up in Pervis' home. Pervis, Shrager and Pauley agreed to the payment of certain home expenses in recognition of the HSK office located at Pervis' home. Pervis opened a separate office on Pike Street in November 2005, but also claims she maintained her home office. HSK paid all expenses of the separate office after November 2005.

The evidence shows that when HSK originally became affiliated with the People Store, an outside accountant performed the accounting work for HSK. Shortly thereafter, though, all parties agree the Debtor became solely responsible for the HSK books. (The parties disagree as to why that decision was made but agree Debtor was responsible for the HSK books.) Pervis paid herself the agreed-upon salary but also paid numerous personal expenses from the HSK account.

Pervis states the expenses she paid were all covered by an "allowance" which was agreed to by Pauley and Shrager. Pervis claims the "allowance" could be used for any expenses, not just the designated ones. Pervis points to Plaintiff's Exhibit 14 which is identified as a merger proposal. While she acknowledges the bullet points at the top of the page were not agreed to by Shrager and Pauley, she asserts the monthly expenses itemized on Plaintiff's Exhibit 14 were agreed to by Shrager and Pauley. Pervis states she was to get the following:

| | |
|---|---|
| Salary | $3,000 |
| Car Payment | $500 |
| Car Insurance | $80 |
| Cell Phone | $75 |
| Copier Lease | $100 |
| Phone/Fax Lines | $300 |
| Long Distance | $50 |
| Utilities | $300–$400 |
| Accounting Fees | $300 |
| Health Insurance | $350 |

Pervis created an "allowance log" (Exhibit 115a) which she claims includes all the expenses charged against her allowance. The log was created in preparation for litigation in December 2009.

| | |
|---|---|
| Salary | $3,000 |
| Car Payment (if actual) | $500 |
| Car Insurance | $80 |
| Cell Phone | $75 |
| Utilities of 1 room | Amount undetermined |
| Health Insurance (if actual) | |

The disagreement between the parties on the expenses focuses on whether the "allowance" is based on actual expenses or can be used by Pervis in any way she chooses, and also whether certain items of expenses were limited, such as utilities and phone. The parties also disagree as to whether accounting fees were allowed to the Debtor. At the close of the evidence, HSK modified its claim for conversion by agreeing the Debtor could retain reimbursement for all home utilities and phone until November 2005 when she opened a separate office for HSK.

 The Court finds that the agreement for the payment of an "allowance" by Shrager and Pauley was based on actual expenses incurred by the Debtor, and was not money to be freely used by Pervis for any item. An expense allowance is just that; it is meant to reimburse a party for actual expenses incurred. If money were to be given to the Debtor to be used in any way she wished, it would be salary. Moreover, the Court finds the purpose of the agreement was to reimburse the Debtor for expenses incurred in connection with her business and not simply to support her family or lifestyle. The Court finds that the Debtor was entitled to reimbursement of an actual car payment, but was not

Pauley and Shrager state, however, they agreed to only the following:

entitled to an allowance for a car payment once the car was paid off. The Court finds there was no agreement for the payment of health insurance if the Debtor was not actually paying for health insurance. The undisputed evidence was that, in 2002 and for many years, the Debtor was covered by her husband's health insurance at no additional cost. That health insurance cost would not be reimbursed. The Court finds that, with respect to utilities and phone, the agreement was for an allowance for actual expenses reasonably necessary to operate the business at Pervis' home, while that was the sole office. The Court finds there was no agreement for the payment of accounting fees. The Court will address each category of expenses and Debtor's liability for them below. In the Summary Judgment Order, the Court ruled the statute of limitations barred HSK's claims for conversion arising prior to June 20, 2005.

*Cash.* Exhibit 71 is a report run by HSK from its Quicken accounting system reflecting all cash withdrawals by the Debtor. The Debtor satisfactorily explained all entries [6] except the check dated August 28, 2005 for $450. This check was listed by the Debtor on her allowance log. Since there is no allowance for this entry, the Debtor is liable to HSK for $450.00.

**6.** The other entries are related to a seminar the Debtor conducted on behalf of HSK and to business travel.

*Neiman Marcus.* Plaintiff's Exhibit 112 is a printout of HSK checks to Neiman Marcus. The Court finds that two of the charges were for client gifts. However, charges in the amounts of $774.27 were listed by the Debtor on her allowance log, thus acknowledging they were not business expenses. Since the allowance is not permitted for such items, the Court concludes the Debtor is liable to HSK for $774.27.

*Phone.* Plaintiff's Exhibit 78 is a printout of checks written by HSK on various telephone accounts. The record reflects multiple charges for cell phones, land lines, long distance, internet and cable. After hearing the Debtor's testimony, HSK reduced its claim from over $24,000 to $5,102.55, representing the amount paid by HSK for the Debtor's home phone after the office moved in November 2005. The Court finds there was no agreement to pay the Debtor's home phone expenses when the primary office of HSK was located elsewhere, and the Debtor is liable to HSK for $5,102.55.

*Countrywide.* Plaintiff's Exhibit 72 reflects checks made payable by HSK to Countrywide, the Debtor's mortgage company. After eliminating the checks, recovery of which is barred by the statute of limitations, a balance of $3,396.45 remains, all of which, according to the Debtor, either was or should have been listed on her allowance log. The Debtor used her "automobile expense allowance" (even though she had no car payment) to justify making home mortgage payments from the HSK account. Since there is no "allowance" that can be used for home mortgage expenses, the Debtor is liable to HSK in the amount of $3,396.45.

*Gwinnett County Tax.* Exhibit 82 is a printout from HSK's books for checks made payable to Gwinnett County taxing authorities. The Debtor testified these payments were for her personal property car tax and tags. The Court finds there was no agreement for the payment of such expenses, and the Debtor is liable to HSK for them in the amount of $865.34.

*Bank of America.* Exhibit 81 is a printout of checks written from HSK's account to Bank of America. The Debtor testified all of these items in the amount of $2,200 were identified on her allowance log. Since there was no allowance for these items, the Court finds the Debtor is liable to HSK in the amount of $2,200.

*Utilities.* Plaintiff's Exhibit 80 is a printout of checks written to various utility companies. According to the Debtor, all of the items on Exhibit 80 were included on her allowance log, except checks on June 13, 2006 for $332.10 and June 15, 2007 for $417.08, both of which are also listed on Plaintiff's Exhibit 82 as payable to the Gwinnett County Taxing Authority (and recoverable under the section above). While HSK initially claimed it was only required to reimburse the Debtor for the equivalent of one room's worth of utilities, HSK modified and simplified its claim to the Debtor's benefit. HSK agreed not to challenge any of the utilities paid on the Debtor's house (which includes her whole house utilities, internet and cable) prior to the opening of the HSK office in a separate location in November 2005. The revised amount for utilities paid by HSK for the Debtor's home after HSK had a separate office is $4,078.62. The Court finds this claim to be reasonable based on the facts, and finds the Defendant liable to HSK in that amount.

*Insurance.* Plaintiff's Exhibit 79 is five pages of transaction reports from HSK's Quick Books. It reflects the Debtor used HSK's account to pay for car insurance through Alfa Insurance Company, health insurance at Kaiser, life insurance at American General, property/liability insur-

ance at The Hartford, and various other insurance through Burnett Insurance Company and Safeco, among others. After hearing the Debtor's explanation as to some of the charges, HSK revised its claim for recovery of money paid on insurance to eliminate any payments barred by the statute of limitations, as well as any payments made to Kaiser, Travelers or Alfa Insurance. The Debtor testified she listed the payments to Burnett Insurance and Safeco Insurance on her allowance log, as an acknowledgement that those were not business expenses but expenses she was crediting with her "allowance". The Debtor testified, however, that The Hartford insurance was business liability insurance and the entry on September 20, 2005 to Hoffman Henry is for renters insurance, both of which the Court finds to be appropriate. Since the Court has already concluded there was no basis for taking an allowance for personal expenses, the Debtor is liable to HSK for insurance payments made to American General, Burnett and Safeco after June 20, 2005. The charges for which the Debtor is liable total $1,963.62.[7]

*American Express.* All parties agreed the Debtor held an American Express card in HSK's name which was to be used for corporate expenses. As the holder of the card, the Debtor was also personally liable for all the charges on the American Express card. She therefore concluded she could charge personal expenses on the card, and the Court notes American Express was identified as an unsecured creditor in her bankruptcy case in the amount of $29,327.02.

Plaintiff introduced Exhibit 52, which is a summary of all Debtor's charges on the American Express card. Shrager, on be-half of HSK, testified she reviewed each charge and any charge she could not identify as a business charge she labeled as a "suspicious charge". The amount of suspicious charges she identified initially totaled $74,795.45, and the charges are set out in Exhibit 52. Through the course of testimony, Shrager accepted an explanation as to $10,000 of "suspicious" charges on the American Express bill so reduced that category to $64,795.43. The Debtor testified that, in her review of the American Express bill, there was an additional $14,683.42 of charges Shrager had identified as "suspicious" that were business expenses. These expenses included office supplies, business travel, client gifts, and the like. Shrager disputed the Debtor's testimony, but the Court finds the $14,683.42 in charges explained by the Debtor should be deleted from the "suspicious" charges as the Plaintiff has the burden of proving the charges made on the card were *not* business expenses. The balance of suspicious charges is then $50,112.03.

Shrager's analysis showed the total charges on the card by the Debtor were $99,175.00 and the total payments made by HSK on the account were $54,035.00. An additional $13,414.00 was paid "from unknown sources". The parties' primary dispute is how the $54,000 payment is applied. HSK contends the payment is applied first to the suspicious charges and therefore is fully recoverable, while the Debtor contends the payment should be applied first to the proper charges and only secondarily to the suspicious charges.

█ The burden of proving conversion is on the Plaintiff. That means the Plaintiff has to prove by a preponderance of the

---

7. The Court notes that, of the five pages making up Exhibit 79, pages 3, 4 and 5 are duplicative of the entries on page 1 and that page 2 of the exhibit consists entirely of Alfa Insurance.

evidence that the money paid by HSK paid the personal expenses of the Debtor rather than paying the valid business expenses. Since the total charges were $99,175.00, and the "suspicious" charges, which the Court finds to be personal expenses of the Debtor, were $50,112.03, the Court concludes $49,063.00 of the charges on the American Express card were valid business expenses. Plaintiff is effectively asking the Court to *assume* the Debtor violated the law by using HSK funds to pay personal expenses first, rather than proving it. The Court concludes the HSK payment is applied first to valid expenses of $49,063.00 so the amount of the HSK funds that paid the Debtor's personal expenses was $4,972.00, for which the Debtor is liable.

*Debit Card.* HSK claims the Debtor used her HSK debit card for personal expenses and introduced Plaintiff's Exhibit 76 as a summary of all such expenses. Shrager testified on behalf of HSK that she reviewed the list of debit charges and believed $14,487.49 of the charges were not business expenses. The Debtor testified to the basis for some of the specific charges, particularly printing and office supplies, so HSK then reduced its claim to $13,278.44. Although the Plaintiff has not produced evidence as to specific charges that make up the $13,278.44 claim, the Debtor testified that, when she used the debit card for personal expenses, she included them on her allowance log to be offset against the allowance she claimed. The Court therefore concludes expenses charged on the debit card, as evidenced by Exhibit 76, which are also identified on the Debtor's "allowance log", Exhibit 115a, are personal expenses. Since the Court has already held there was no allowance to be used for personal expenses, those items were inappropriately paid by HSK. Of course, certain of the expenses charged with the debit card are part of the allow-

ance. For example, the Travelers insurance charges are frequently made with the debit card. Since Shrager testified she is accepting the Travelers insurance charges identified on Exhibit 79, the Court has deemed any debit charges to Travelers insurance to also be appropriate. The Court concludes $2,228.87 of the debit charges are identified on Debtor's allowance log and not covered by the "allowance", either agreed to by the Plaintiff or otherwise found by the Court to be appropriate, and the Debtor is liable to HSK in that amount.

*Summary*

In summary, the Court finds the following amounts were paid by Hot Shot Kids on the Defendant's personal expenses:

| | |
|---|---|
| Cash | $450.00 |
| Debit | $2,228.87 |
| Neiman Marcus | $774.27 |
| Phone | $5,102.55 |
| Countrywide | $3,396.45 |
| Gwinnett County Taxes | $865.34 |
| Bank of America | $2,200.00 |
| Insurance | $1,963.62 |
| American Express | $4,972.00 |
| Utilities | $4,078.62 |
| Total | $26,031.72 |

The Plaintiff has therefore shown that HSK had title to the funds, that the Defendant took the funds in the amount of $26,031.72 from HSK, that HSK has demanded possession of them and that the funds have not been returned. The Debtor is liable to Plaintiff for conversion in the amount of $26,031.72.

*Dischargeability*

■ HSK contends its claim for conversion of its funds is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (a)(4). As discussed above, embezzlement under 11 U.S.C. § 523(a)(4) can be established by showing that (i) property owned by another is rightfully in the possession of the debtor; (ii) the debtor appropriates

the property for personal use, and (iii) the appropriation occurred with fraudulent intent or by deceit. It is undisputed that property owned by HSK was rightfully in the possession of the Debtor, who as the president of HSK had control over the bank account. The Court has concluded the Debtor appropriated the sum of $26,031.72 for her personal use.

The next question is whether the appropriation occurred with fraudulent intent or by deceit. In determining intent to defraud, the court takes into consideration all circumstances and the defendant's state of mind can be interpreted by her conduct. Knowingly making a representation or taking a position without an underlying factual basis for it can evidence subjective intent to deceive. *In re Johnson*, 477 B.R. 156 (10th Cir. BAP 2012). The Court concludes the Defendant appropriated the sum of $26,031.72 with intent to deceive.

The Debtor's defense to paying many of her personal expenses out of the company account was that she was given an "allowance". The Court finds there was no basis on which the Debtor could have thought an allowance for specified purposes meant she could use that money for other expenses or for purposes not identified in the initial agreement. For example, even if the Defendant believed she had an allowance to make a car payment, there is no basis on which she could have believed that once the car was paid for she could use that same amount of money to buy clothes at Neiman Marcus or make her house payment. The Debtor acknowledged as much by creating an "allowance log" only after the commencement of litigation. If the Debtor actually (albeit unreasonably) believed she was entitled to a credit, she would have had a mechanism for tracing an allowance at the time of the expenditures. Debtor was, after all, the sole bookkeeper of the company. Moreover,

many of the categories of "allowance" she took were never discussed with Shrager or Pauley, such as cash, clothes and her home mortgage, so Pervis knew they were not permitted expenses. Deceit is also evidenced by Debtor's incorrect booking of certain expenses. For example, she booked the payment of her mortgage as her car expense, booked personal Neiman Marcus charges as "talent overhead", and booked payments to Bank of America as "talent pay". Finally, even with respect to categories such as utilities and phone that were discussed and agreed to at some amount with Shrager and Pauley and which were accurately described in the books, the Court concludes the Debtor knew there was no factual basis for taking the position that HSK should pay her home utilities and phone once there was a separate office for HSK. The Court therefore concludes the sum of $26,031.72 is nondischargeable under 11 U.S.C. § 523(a)(4).

### Request for Punitive Damages and Attorney's Fees

Both HSK and Brenda Pauley have asked the Court to award punitive damages and attorney's fees under O.C.G.A. § 13–6–11.

*Punitive Damages*

 Under Georgia law, punitive damages may be awarded "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51–12–5.1(b). The purpose of punitive damages under Georgia law is not to compensate the plaintiff but "solely to punish, penalize or deter a defendant." O.C.G.A. § 51–12–5.1(c). Finally, the award of punitive damages is left "to the enlightened conscience

of [the] fair and impartial jury". *Scott v. Battle,* 249 Ga.App. 618, 621, 548 S.E.2d 124 (2001). In this case being tried without a jury, the award of punitive damages, or the amount thereof, is left to the enlightened conscience of the trier of fact.

▮ While the Court has found the Defendant civilly liable to Pauley for fraud and to HSK for conversion and breach of fiduciary duty, the Court declines to award punitive damages. The Court concludes that finding a debt non-dischargeable is a significant deterrent in and of itself and no further deterrent in the form of punitive damages is necessary.

*Attorney's Fees*

▮ Hot Shot Kids and Pauley seek recovery of attorney's fees under O.C.G.A. § 13–6–11 which provides that expenses of litigation are not allowed as part of damages unless the party has acted in bad faith, been stubbornly litigious, or caused the plaintiff unnecessary trouble and expense. Even then, an award of fees is discretionary and not required. See *In re Estate of Zeigler,* 295 Ga.App. 156, 161, 671 S.E.2d 218 (2008). Whether to award attorney's fees and the amount awarded is a question for the trier of fact. *Daniel v. Smith,* 266 Ga.App. 637, 597 S.E.2d 432 (2004).

▮ The Court concludes that Pervis acted in bad faith with respect to Pauley and caused her unnecessary trouble and expense. The Debtor had few valid defenses to Pauley's claim, so the Court finds an award of attorney's fees to Pauley on her claim related to Exhibit A Talent is appropriate. The Court concludes otherwise with respect to the remaining claims. HSK failed on a substantial amount of its damage claims related to Non–Exhibit A Talent, JPTA and the Debtor's payment of personal expenses. The claims in these three categories were significantly over-

stated and, in the Court's opinion, this gross overstatement extended the litigation and thwarted any efforts at resolution which the Debtor attempted on several occasions. The Court therefore declines to award attorney's fees to HSK on the claims related to the Non–Exhibit A Talent, JPTA and the personal expenses.

▮ Having decided to award some attorney's fees to Pauley on her Exhibit A Talent claim, the Court must determine the proper amount to be awarded. In this case, the agreement Plaintiffs had with their counsel was a contingent fee agreement for 40%, which would result in attorney's fees of approximately $55,000. The Georgia courts have held that where the trier of fact otherwise decides to award attorney's fees under O.C.G.A. § 13–6–11, the Court can use the amount of the contingency as evidence of fees or other evidence of the amount of actual fees and expenses incurred. See *Home Depot USA, Inc. v. Tvrdeich,* 268 Ga.App. 579, 602 S.E.2d 297 (2004); see also *City of Atlanta v. Hofrichter/Stiakakis,* 291 Ga.App. 883, 663 S.E.2d 379 (2008). However, there is no specific formula to calculate attorney's fees and the determination is a question for the fact finder. *Daniel,* 266 Ga.App. at 641, 597 S.E.2d 432. In this case, where only one plaintiff and one cause of action supports the award of attorney's fees, it will be difficult for counsel to separate time spent on just the Exhibit A Talent claim. Moreover, the Court believes the chances of resolution of the Exhibit A Talent claim would have greatly increased had the remaining three claims not been tied up with it and the two Plaintiffs not been connected. Consequently, the Court concludes $25,000 in attorney's fees is an appropriate amount to be awarded to Pauley on the Exhibit A Talent claim.

## *CONCLUSION*

After considering all of the evidence, the Court issues judgment as follows:

1. To Brenda Pauley on the Exhibit A Talent claim in the amount of $137,094.15 plus $25,000.00 in attorney's fees.

2. To HSK for payments from Osbrink on Non–Exhibit A Talent in the amount of $8,644.56;

3. To HSK for conversion of funds used for personal expenses in the amount of $26,031.72.

Each of the foregoing is found to be non-dischargeable.